Board of Drainage Com'rs of Drainage Dist. No. 10 of
Bolivar County et al. v. Board of Drainage Com'rs
of Washington County et al.

[95 South. 75. No. 23186.]

1. Venue. *Suit to enjoin drainage into stream so as to cause overflow of lower lands maintainable in county in which such land situated.*

A suit by a drainage district in W. county to enjoin similar districts in B. county from draining into a stream and thereby causing it to overflow lower lands, situated within the complainant district, could be brought in the chancery court of W. county, under Hemingway's Code, section 321, Code 1906, section 561, requiring suits respecting real property to be brought in the. chancery court in the county in which the property may be.

2. Waters and Watercourses. *Upper owner may not collect surface waters and discharge them on adjoining land.*

Upper owners on a watercourse have the natural and legal right to drain their .surface waters into the watercourse, but an adjoining owner cannot collect surface waters and discharge them in a body upon adjoining owners.

3. Waters and Watercourses. *Upper owner entitled to drain into stream, though lower owner's lands thereby overflow.*

An upper owner may reasonably drain his surface waters into a natural watercourse, as required by good husbandry, and may exercise this 'right without qualification or limit, and if he thereby increases the flow ofι the stream beyond its capacity resulting in flooding and damaging a lower owner, such damage is *damnum absque injuria* for which no right of action lies, especially where the overflow is due to the fact that other owners also exercise their right to drain into the stream.

4. Waters and Watercourses. *In suit to enjoin drainage into stream, allegations held insufficient to invoke rule as to following plan not injuring others.*

In suit by drainage district to enjoin other similar districts from draining into a stream thereby causing it to overflow lower lands within the complainant district, an allegation that defendants could avoid the disastrous consequences to complainants by constructing a cut-

off into a certain river which could be constructed at a cost not prohibitive, was not sufficient to entitle complainant to the benefit of the rule that, where there are two reasonable ways of doing a thing, one of which would damage complainant and the other do him no injury, the latter plan should be followed.

Appeal from chancery court of Washington county.

Hon. E. N. Thomas, Chancellor.

Suit by the Board of Drainage Commissioners of Washington County and others, against the Board of Drainage Commissioners of Drainage District No. 10 of Bolivar County, Mississippi, and others. From a decree overruling demurrers, defendant appeal. Reversed, and bill dismissed.

*Roberts & Hallam,* for Appellant.

The Chancery Court of Washington County, Mississippi Had no Jurisdiction of This Suit. This court has held that a drainage district organized under chapter 195 of the Laws of 1921, as amended by chapter 269 of the Laws of 1914, is a body politic and corporate; *Atchafalaya Drainage Dist.* v. *Nicholson,* 89 So. 619, and that it is an involuntary public corporation. *Stevens* v. *Beaver Dam Drainage Dist.,* 86 So. 641.

It is therefore apparent from these decisions, and from the foregoing allegations of the amended bill, that the appellant drainage districts, and each of them, are municipal or public corporations exercising the functions of government in Bolivar county, Mississippi, the place of their creation, and that they must, necessarily, have their *situs* and domicile in that county. This being true, we assert that all suits and actions of whatever nature against either or all of said drainage districts must be instituted in the county of Bolivar, Mississippi, and that the courts of no other county have jurisdiction over them. We cite below authorities which hold that it is the general rule that actions against municipal or public corporations are strictly local under the general rule of public policy. 19 R. C. L., Title "Municipal Corporations," sec. 338, page 1049;

28 Cyc., Municipal Corporations, page.1759; 14 Encycl'
pædia of Pleading and Practice, at page 228; *Phillips* v.
*Baltimore,* reported in 25 L. R. A. (N. S.) at page 711;
*Nashville* v. *Webb,* reported in 114 Tennessee, at page 432;
4 Ann Cas. 1169; *Leigh County* v. *Klecker,* 5 W. & S. (Pa.)
181, 186, 188; *Oil City* v. *McAboy,* 74 Pa. St. 249, 252;
*Pack* v. *Greenbush Tp.,* 62 Mich. 122, 28 N. W. Rep. 746;
*Potts* v. *Pittsburg,* 14 W. R. C. (Pa.) 38; *Townsend* v.
*School District,* 12 N. J. L. 312; *Pack* v. *Greenbush Tp.,*
62 Mich. 122; *Johnston* v. *Cleveland County,* 67 N. Car.
101; *Alexander* v. *McDowell County,* 67 N. Car. 330; *Steele*
v. *Rutherford County,* 70 N. Car. 137; *Jones* v. *Statesville,*
97 N.. Car. 86; *Jones* v. *Bladen County,* 69 N. Car. 412;
*Oil City* v. *McAboy,* 74 Pa. St. 249; St. *Francis Levee
District* v. *Bodkin,* 108 Tenn. 700; *Lehigh County* v. *Kleck-
ner,* 5 W. & S. (Pa.) 181; *Heckscher* v. *Philadelphia* (Pa.
1887), 9 Atl. 281; *Osgood* v. *Lynn,* 130 Mass. 335; *Buch* v.
*Eureka,* 97 Cal. 135; *Schuyler County* v. *Mercer County,* 9
Ill. 20; *Ex rel. Johnson, et al.* v. *District Court, etc.,* 120
Minn. 458; *Pack* v. *Township of Greenbush,* 62 Mich. 122,
28 N. W. 746; *Jones* v. *Statesville,* 97 N. C. 86, 2 S. E. 346;
*Oil City* v. *McAboy,* 74 Pa. St. 249; *North Yakima* v. (460)
*Superior Court of King County,* 4 Wash. 655, 30 Pac. 1053;
*Fostoria* v. *Fox,* 60 Ohio St. 340, 54 N.'E. 370; *Heckscher*
v. *Philadelphia,* 9 Atl. 281; R. L. 1905, pp. 4089, 4090,
4091, 4092, and 4094.

Furthermore, section 4095, has no bearing upon the
character of such an action, for under the same the venue
in an action against a municipality may originally be laid
in the county in which the municipality is situated, no
matter how many individual defendants there may be.
The venue, when so laid, however, would be subject to
change under section 4095, if such section applies to an
action to which a municipality is a party defendant, and
this is the ultimate question to be determined in this case.
We do not think this section so applies, for, as we have
stated above actions against municipalities must still be
regarded as local. 32 L. R. A. 595, 601; 43 Am. St. Rep.

134, 139; 3 Dunnell (Minn.) (461) Digest, 8958; *Phillips* v. *Baltimore,* 110 Md. 431, 72 Atl. 902; 25 L. R. A. (N. S.) 711; *Nashville* v. *Webb,* 114 Tenn. 432, 85 S. W. 404, 4 Ann. Cas. 1169.

We cite especially and call to the court's attention the case of *Parks Company* v. *City of Decatur, Ill,* decided by the circuit court of appeals for the sixth circuit of the United States, and reported in 138 Federal Reporter at page 550. In that case, that court (being held by Justice LURTON and Judge SEVERANCE), held flatfootedly that a municipal corporation was not suable by attachment in the courts of another state.

APPELLANT DRAINAGE DISTRICTS HAVE A RIGHT TO DRAIN THEIR SURFACE WATERS INTO A NATURAL WATER COURSE REGARDLESS OF THE FACT THAT SUCH SURFACE WATER WILL OVERTAX THE CHANNEL CAPACITY OF THE STREAM. 27 R. C. L., under the head of "Waters," page 1156, section 81; *Pack* v. *Harrington,* 109 Ill. 611, 50 Am. Rep. 627; *Fenton, etc. Co.* v. *Adams,* 221. Ill. 201; *Peck* v. *Herrington,* 1 A. L. R. 171; *Vannest* v. *Fleming,* 79 Ia. 638, 18 A. S. R. 387; 8 L. R. A. 277; *Martin* v. *Schwertley,* 155 Ia. 347; 40 L. R. A. (N. S.) 160; *Dorr* v. *Zimmerman,* 127 Ia. 551, 103 N. W. 807; *Hull* v. *Harker,* 130 Ia. 190, 106 N. W. 629; *Baldwyn* v. *Ohio Tp.,* 70 Kan. 102, 109 A. S. R. 414; 67 L. R. A. 642; *Hooper* v. *Wilkinson,* 15 La. Ann. 407, 77 Am. Dec. 194; *McCormick* v. *K. C. St. J. & C. B. R. R. Co.,* 70 Mo. 359, 35 Am. Rep. 431; *Kaufman* v. *Greisemer,* — P. St. 415; and *Waffle* v. *N. Y. Central,* 59 Barb. 413; *Waffle* v. *N. Y. Central,* 53 N. Y. 11, 12 Am. Rep. 467. The case of *Noonan* v. *City of Albany,* 79 N. Y. 470, 35 Am. Rep. 540, so much relied on by appellee does hold that one can not, under circumstances, drain his surface waters into a natural watercourse, regardless of the damage done to a lower proprietor, but that case merely involved the obstruction of a natural watercourse by the upper proprietor, as well as the pollution thereof by draining sewage therein which was deposited on the land of the lower proprietor. All else in the

case was *dicta.* This view is concurred in by the author of the note appended to that decision at page 542 of 35 Am. Rep., where it is said, referring to the Noonan case—

"This appears to be a clear case of negligent interference with a natural stream, and what is above stated, in regard to a private riparian proprietor may be *obiter,* although it is probably the law." *McCormick* v. *Horan,* 81 N. Y. 86, 37 Am. Rep. 479, was a suit by an upper proprietor for damming by a lower proprietor of the channel of a natural watercourse to the damage of the upper owner, the plaintiff having drained water accumulating in an excavation made for quarry purposes on his land into the watercourse. The court held that the upper proprietor had the right to so drain, and that the lower owner had no right to dam the channel. But in accordance with our view that the great majority of the cases cited in support of the proviso are *dicta,* the court there unnecessarily said: "This right is subject to the qualification that one owner cannot, by artificial arrangements on his land, concentrate and discharge into the stream surface water in quantities beyond the natural capacity of the stream, to the damage of other owners," citing *Noonan* v. *City of Albany,* supra.

In *Staton* v. *Norfolk, etc. R. R. Co.,* 111 N. C. 278, 16 S. E. 181, 17 L. R. A. 838, the proviso is not supported. The court there seems to hold that the defendant had by means of ditches, diverted into a stream, surface waters which would not naturally drain in that direction. *Mizell* v. *McGowen,* 129 N. C. 93, 39 S. E. 729; 85 A. S. R. 705, utterly repudiates the qualifying proviso. *Mason* v. *Fulton County Commissioners,* 80 Ohio St. 141, 88 N. E. 401, 131 A. S. R. 689; 24 L. R. A. (N. S.) 903, holds that an upper proprietor's land which has been drained by means of articial drains into natural watercourses is not chargeable with an assessment along with the lands of lower proprietors made for the purpose of raising funds with which to dig a ditch or an improvement on the lower lands to prevent overflow from the watercourse to the damage of lower lands. The case, however, approvingly cites *Mizell* v. *Mc-*

*Gowen,* 129 N. C. 93, 85 Am. St. Rep. 705, 39 S. E. 729. The cases in the note to the *Mason case* in 24 L. R. A. (N. S.) cited in support of the quotation are *Noonan* v. *Albany,* 79 N. Y. 470, and *Hicks* v. *Owensboro,* 6 Ky. L. Rep. 225.

In the case of *Miller* v. *Laubach,* 47 Pa. St. 154, 86 Am. Dec. 521, the facts were that defendant, by means of a drain or ditch, drained a marsh and emptied the waters from the marsh onto plaintiff's land. There was no question about the right to overflow a natural watercourse. *Rhoades* v. *Davidheiser,* 133 Pa. St. 226, 19 A. S. R. 630, had to do with the obstruction by the upper proprietor, the defendant, of a natural watercourse on his own land, and the diversion of the water by means of ditches to and upon the land of the plaintiff, the lower owner, to the injury of the latter. No question of the right to overcharge a natural channel arose therein.

In *Meixell* v. *Morgan,* 149 Pa. St. 415, 34 A. S. R. 614, all that was there held was that the upper proprietor had the right by means of underground and artificial drains, to collect surface water on his land and discharge it upon the land of the lower proprietor at a single point which is the natural watershed of both tracts, and at which there is an open ditch on the lower land, although a larger quantity of water is thus discharged at that point than would naturally flow there by surface drainage, provided care is taken not to do unnecessary injury to the owner of the lower land. Overflowing a natural watercourse was not considered. *Shaw* v. *Ward,* 131 Wis. 646, 111 N. W. 671, 11 Ann. Cas. 1139, did not involve the questioned right to overflow a natural watercourse.

To the same effect as *Shaw* v. *Ward, supra,* is *Manteufel* v. *Wetze,* 133 Wis. 619, 114 N. W. 91; 24 L. R. A. (N. S.) 167. No natural watercourse was involved. *Gray* v. *Mc-Williams* (Cal.), 21 L. R. A. 606, did not have reference to overcharging a natural watercourse. The cases cited in the note in 2 Ann. Cas. 198, do not relate to the right to overcharge a natural watercourse. They have reference to the right to drain ponds or lakes over adjoining lands.

We have now discussed all of the cases cited as support-
ing the proviso in question in 27 R. C. L., page 1156, sec.
81.   Another text relied on by appellees is 30 Amer. and
Eng. Ency. Law (2 Ed.), pp. 343 and 344, where it is said:
"This right of drainage into watercourses is, however, sub-
ject to the qualification that the landowner cannot, by ar-
tificial means, to the damage of other owners, increase the
volume of surface water flow into a watercourse beyond
the natural capacity thereof."

The only cases cited in support of that qualification are
in note one, and are: *Jackman* v. *Arlington Mills,* 137 Mass.
277; *Noonan* v. *Albany,* 79 N. Y. 470, 35 A. R. 540; *Mc-
Cormick* v. *Horan,* 81 N. Y. 86, 37 A. R. 479, which we
have already discussed.   The other case cited is *Mizell* v.
*McGowen,* 125 N. C, 93, 85 A. S. R. 705, one which the ap-
pellant relies on, and which utterly explodes the appellees'
theory and the reasoning of the cases they rely on.

Another text relied on by appellees will be found in 40
Cyc. at page 648.   *Broadwell, etc., D'ge Dist.* v. *Lawerence,*
231 Ill. 86, 83 N. E. 104, the first case cited in note 40 under
this text, did not involve the overtaxing of a natural water-
course.

*Ribordy* v. *Murray,* 117 Ill. 134, denied the right of ap-
pellant landowner to obstruct a ditch on his own land
which connected with a ditch made by highway commis-
sioners, and also a ditch on the land of another owner.   The
court held that the ditch on the land of appellant followed
a natural watercourse, and the natural drainage of the
land and that he could not dam it up especially in view
of the fact that he had acquiesced in the construction of
the connecting ditches.   Overcharging the channel of a
natural watercourse was not considered.

*Lambert* v. *Alcorn,* 144 Ill. 313, — N. E. 53, 21 L. R. A.
611, holds that a swale or depression which gives water a
fixed and determinate course is a watercourse, and that one
through whose land a swale runs may tile-drain his land
into the same even though the flow of water on the lower
proprietor through whose land the swale also runs is in-

creased.  The court quotes with approval from *Dayton* v. *Drainage Commissioners,* 128 Ill. 271, 21 N. E. 198.

*Rath* v. *Zembleman,* 49 Neb. 351, 68 N. W. 488, holds that one draining a pond into a draw between his own and plaintiff's land is not liable in damages for the destruction of plaintiff's hay in the draw by reason of the increased flow therein.  *McCormick* v. *Horan* (N. Y.), and *Waffle* v. *New York* (N. Y.) have been noticed above.  *Foot* v. *Bronson,* 4 Lans. (N. Y.) 47, holds that an owner of lands may not relieve them from standing water, or prevent its accumulation thereon by discharging it through drains or ditches upon the lands of his neighbor; but that surface water may be drained into a natural stream without regard to injury resulting therefrom by increase or diminution in the volume of its waters to the riparian owners.  *Davison* v. *Hutchinson,* 44 N. J. Eq. 474, did not involve drainage of waters into a natural watercourse, thereby overflowing its banks.

We call the court's attention to the following cases which are in line with the holding in the Indian Creek case: *Jones* v. *George,* 89 So. 291; *Levee Commissioners* v. *Harkelroad,* 62 Miss. 807; *Richardson* v. *Levee Commissioners,* 68 Miss. 539; *Richardson* v. *Levee Commissioners,* 77 Miss. 518; *Cubbins* v. *Miss. River Commissioners,* 241 U. S. 351.

Especially is this true where the actions complained of are expressly authorized by the legislature in the exercise of its police powers; here the purpose of the drainage is to make the lands in the district more sanitary, and where, in the organization of a drainage district the Legislature has, as here, expressly authorized the use as a natural watercourse for drainage purposes.  *Lainhart* v. *Catts,* (Fla.) 75 So. 47, 52; *Dave* v. *Florida Power Co.* (Fla.), 60 So. 759; *Killiam* v. *Norfolk and N. P. Co.* (Va.), 6 L. L. R. A. 701; *Mizell v. McGowan, supra; San Gabriel Valley Country Club* v. *Los Angeles Co., supra; Maben* v. *Olson,* 175 N. W. 512; *Petite Anse Drainage Dist.* v. *Youngsville Drainage Dist.* (La.), 83 So. 445; *Fisher* v. *Seaboard Air Line* (Va.), 1 Ann. Cas. 622.

Seeking to get the benefit of the rule announced in *Holman* v. *Richardson,* 115 Miss. 169, to the effect that one must so use his own as to not injuriously affect another, the complainants in the court below alleged in their bill that appellants could secure as good or better drainage, than they would secure under the plans adopted by them by constructing a cut-off from Bogue Phalia below and outside the boundaries of appellee district, to Porter's Bayou, and by enlarging the channel of Porter's Bayou to the Sunflower, thus diverting the waters of Bogue Phalia to the Sunflower River, without causing any injury to appellees here.

We wish to emphasize the fact, however, that complainants do not suggest any other plan by which appellants could secure the drainage which the plans adopted by them will enable them to have.

*Sillers, Clark & Sillers,* for appellants.

The right of landowners to organize drainage districts and turn the water from the water sheds of their lands into the natural streams into which they have always, by nature, been drained, even though the turning of such water into such stream may accelerate the flow of the water and cause the stream at times, to overflow lands along the lower reaches of the stream, is given by law. This is a right guaranteed to the people of the Yazoo Delta both by the condition imposed by the Government in the grant of these lands to the state to levee and drain them, and by the statutes enacted for the purpose of carrying into effect this condition.

Here a great, fertile section of the state, seeking relief and reclamation from the stagnant waters of a flat country, in pursuance of the contract under which the territory was granted to the state by the government, to levee and drain this high section by and with the legislative authority, is carrying out a trust imposed. The weal or woe of a people is at stake, as well as the welfare of the individual land-

owner.   The landowner's interest is incidental compared to the great public interest.   The questions involve a public policy, as well as individual benefits, and call for the broad vision of statesmanship as well as judicial liability.

The cases cited and quoted by counsel for appellee do not fit or apply in such a case as this.   The filling up of a rill or brook with artesian and sewerage water bears no relation to the drainage of a great agricultural country where the health and prosperity of thousands of people who occupy the country, and the millions that will occupy it, are involved.

This court has said that it has adopted neither the common law nor the civil law in their entirety, but reserves the right to apply the principles of both, or either, or neither, as the facts and exigencies of the case may demand, and we apprehend that the court will not be governed by the restricted construction sought to be imposed by appellees but rather, will adopt the broader and more practical doctrine laid down in *Mizell* v. *McGowan* and *San Gabriel Country Club* v. *Los Angeles County,* cited in our brief in chief on this question.   The Mizell case deals with an agricultural problem similar to that involved in the instant case, though not on as broad or gigantic scale, but the subject-matter is similar, and the reasoning of this case and the San Gabriel case is in point and more appealing, and practical in their conclusions.   Both of these cases show the far reaching, hurtful effects of the application of the restricted construction of the courts in the restricted small stream areas dealt with in the cases cited by appellees in their brief, the inapplicability of which Mr. Campbell, in his argument and brief for appellants, so fully shows; and the court will turn with relief to the case of *Mizell* v. *McGowan,* from which full quotations are made at page 46, et seq., of our brief in chief.   Also the case of *San Gabriel Country Club* v. *Los Angeles County,* 188 Cal. 757, page 38, our brief.

Counsel for appellees quotes from Mr. Freeman.   He didn't quote far enough; Mr. Freeman, in his note, in 85

Am. St. Rep. 727, reviews very thoroughly, the authorities dealing with the right to accelerate or diminish the flow of water, and at page 733, says: "We have just noticed the difference between merely draining into another's land and draining into a natural channel or watercourse, which flows across such land. So far as the streams or natural watercourses are concerned, there can be no doubt that one can drain into them and thereby increase their volume without subjecting himself to liability for any damage suffered by a lower landowner." We cite numerous authorities showing the right of the landowner to drain his lands of surface waters into the natural streams which are of the water shed of his lands.

The contention of appellees, as applied to a country like the Yazoo Delta, with its flat lands and myriads of streams and rain and seepage water, and the Mississippi River water flowing in at the lower end of the Delta, and the back water from the Yazoo, where it meets the waters of the Mississippi, is a very different project than dealing with small rills, brooks and ravines. The court will have a man-size problem if it decrees that the natural streams of the Delta shall not be overcharged, and undertakes to enforce its decree. We do not mean that the people of the drainage districts would resist enforcement of the court's decree. We mean that they won't know how to enforce it.

The common law and the civil law gives landowners the right to drain into natural streams. The United States Government and the state of Mississippi contracted to drain these lands. The state has a plan which is provided in the Laws of 1921, sec. 4396, Hemingway's Code (Laws 1912, ch. 198, in effect March 16, 1912).

Under this statute the drainage districts may "locate and establish levees, drains or canals and cause to be constructed, straightened, widened or deepened any ditch, drain or watercourse, and to build levees or embankments, etc., for the purpose of reclaiming wet, swamp or overflowed lands" That isn't all. The law provides, and it is de-

clared that the drainage of swamps and the drainage of surface water from agricultural lands, and the reclamation of tidal marshes, shall be considered a public benefit and conducive to public health, convenience, utility and welfare, etc.   And it provides that the drainage commissioners may change or improve the natural watercourses of the district.

It also provides that commissioners shall be appointed, surveyors and engineers employed, etc.—all of which was done in the organization of these districts—all scientifically done according to the provision of the drainage acts, and not in an improvident, haphazard manner, as counsel for appellees seem to think these districts were organized. The presumption of law is that they were organized according to law to carry out the purpose of their organization. Then by what right can the courts regulate them, or stop them, when they are proceeding in accordance with the provisions of law?   Section 4477 provides: "That this act shall be liberally construed to promote the ditching, draining and reclamation of wet, swampy and overflowed lands."

Chapter 196, Laws of 1921, provides: And, "are given full power and authority to construct, or to cause to be constructed, such artificial drains and ditches, etc., and to alter, deepen or improve any and all natural drains and watercourses."

Under this section, Stokes Bayou, Clear Creek and Laban and Lane Bayous can be altered, deepened and improved, so as to carry out its purpose to protect or reclaim lands from overflow from any source.   And that is what these districts are doing, and doing according to law.   Unless the courts declare these statutes unconstitutional or inoperative, for some cause, on what theory will the courts interfere or stop them from operating and compel them to fill up their drains.   These districts have organized according to law and are proceeding strictly in accordance with the statutes; and we cannot see any place for the courts to get in or control or regulate them.   The rights they are exercising are conferred by law and the courts will uphold, not nullify, the law.

And this brings us back to the principle that this is a legislative, and not a judicial question, and its problems must be dealt with and settled by legislative enactment and community agreement. We hope to see at no distant day the Delta organized into one great levee district and into one great drainage district. The people of this great section of the state will eventually settle the Delta problems and settle them rightly. No right-minded community wants to thrive upon the misfortunes of its neighbors, and the Delta will eventually work out these problems in equity and justice to all.

Improved methods of agriculture will devise means of using to advantage and profit the lands temporarily flooded in the springtime, which will raise much needed feed and food crops, which the Delta people so criminally neglect for cotton, all of which can be raised in profusion on these rich lands after the Mississippi recedes in the Spring or early Summer, by the utilization of the Bogue for purposes of irrigation and drainage—indispensable drainage bringing both wealth and health to their owners.

*R. B. Campbell,* for appellant.

The effect of the decree of the court below, overruling the demurrers to complainant's bill, if affirmed by this court, will be to afford greater rights to the owners of land along the lower reaches of a natural watercourse, than to those owning lands along the stream higher up.

The conditions afforded by nature, and the advantages of being higher up the stream, will amount to nothing and lands heretofore understood to be charged with a servitude in favor of lands higher up the stream, will become the dominant estates.

It is said in *McCormick* v. *Horan,* 81 N. Y. 86, that "watercourses are the means which nature has provided for the drainage of the country through which they pass, and from the natural servitude of lands upon a watercourse to receive the waters flowing therein from the lands

above, springs the right of the owner of the superior herit-
age to have the water from his land, of which the water-
course is the natural outlet, drained into and carried off
thereby, and the duty of the owner of the inferior and
servient tenement not to interfere with or obstruct its
passage."

That right belongs to each owner of lands along the en-
tire watercourse; and each, in the reasonable use of his
own land, has the right to effect such drainage, by means
of ditches, or otherwise, and thereby may accelerate the
flow, and increase the volume of water in the stream. 20
Amer. & Eng. Ency. of Law, 341; 40 Cyclopedia of Law &
Procedure, 648; 27 Ruling Case Law, 1156; *Mizell* v. *Mc-
Gowan,* 85 Am. St. Rep. 705, and note; *Waffle* v. *New York
Central R. R. Co.,* 53 N. Y. 11; *Peck* v. *Herrington,* 109 Ill.
611; *Mason* v. *Fulton County Commissioners,* 80 Ohio St.
151; Same case and note thereto in 24 L. R. A. (N. S.) 903;
*Baldwin* v. *Ohio Township,* 70 Kan. 102.

The court will observe that, in speaking as to the right
of the owner of adjacent lands to drain the same, by means
of ditches, into a watercourse, the American and English
Encyclopedia of Law, *ubi supra,* the Cyclopedia of Law
and Procedure, *ubi supra,* Ruling Case Law, Mr. Farnam
on Waters, and the author of the note to *Mason* v. *Fulton
County Commissioners,* in 24 L. R. A. 903, *ubi supra,* each
and all of them qualify that right by a statement, to the
effect, that the flow of the stream is not thereby increased
beyond its natural capacity, to the injury of another; and,
as I understand it, complainants base their right to relief,
in this case upon that alleged qualification of the rule.

Their complaint is that, by draining their lands into
the Bogue, the defendants will drain therein water, which
otherwise would evaporate and would be absorbed by the
land, and will so accelerate the flow, and increase the vol-
ume of water in the Bogue, as to raise its water level at
least three feet, and will, in fact, increase the water be-
yond the natural capacity of the Bogue, and thereby great-
ly damage complainants' land. On the other hand, the

defendants contend, that there is no such qualification of the rule, as stated by the text writers cited. In other words, that the right of an upper owner of land, in the reasonable use thereof, and in the exercise of reasonable care, to drain his land into a natural watercourse, which nature afforded for the purpose, is not limited to the natural capacity of the watercourse.

I respectfully submit that the statement of such qualifications of the rule, as made by those text books, is not supported by the weight of authorities; and not only that, I contend that the cases on which they base their statement of the qualification of the rule, do not support the statement as broadly, and unqualifiedly, made by them. All of them cite in support of their statement of the qualification, *Noonan* v. *Albany,* 79 N. Y. 470; some of them cite that case, and also *McCormick* v. *Horan,* 81 N. Y. 76; while American & English Encyclopedia of Law, *ubi, supra,* cites those cases and, also, *Jackman* v. *Arlington Mills,* 137 Mass. 277, and the author of the Note to *Mason* v. *Fulton County Commissioners,* 24 L. R. A. (N. S.) 903, cites *Noonan* v. *Albany* and *Hicks* v. *Owensboro,* 6 Ky. L. Rep. 225.

I have not had access, up to date, to the Massachusetts case, and the Kentucky case; but I have examined carefully the cases of *Noonan* v. *Albany* and *McCormick* v. *Horan,* the two New York cases, the latter of which merely cites the former, as mere *dictum;* and I unhesitatingly state that the former of these cases—*Noonan* v. *Albany,* does not support the qualification of the rule, as broadly stated by the text books cited. I will call the court's attention to the fact that the supreme court of North Carolina in *Mizell* v. *McGowan,* 129 N. C. 93, which is also reported in 85 Am. St. R. 705, expressly denied any such qualification of the rule, and as I think in an able opinion, demonstrated the fallacy and impracticability of making the natural capacity of a stream the test.

That case was cited, with seeming approval, by the supreme court of Ohio in the case of *Mason* v. *Fulton County*

*Commissioners,* reported in 24 L. R. A. (N. S.) 903, and it was expressly followed and concurred in by the supreme court of California in the very late case of *San Gabriel Valley Country Club* v. *Los Angeles,* 9 A. L. R. 1200, also in 188 Pac. 554, wherein the reasoning of the supreme court of North Carolina in *Mizell* v. *McGowan,* was supplemented by additional reasons why no such qualification of the rule exists and the impracticability of making the natural capacity of a stream the test of the right of drainage therein.

That ruling of the supreme court of California was made, in the face of, and notwithstanding the statements of, the several text writers as to the qualification of the rule. None of the text books, in stating the qualification of the rule except ruling Case Law, seems to be impressed with the fact that the supreme court of North Carolina, in *Mizell* v. *McGowan,* had expressly denied the existence of any such qualification.

Ruling Case Law does take note of that; but, basing its statement of the qualification of the rule of *Noonan* v. *Albany* and *McCormick* v. *Horan,* only, says that: "according to the generally accepted view, it would seem that, where by means of ditches or drains, so much surface water is thrown into a stream as to fill it beyond its natural capacity, and cause it to overflow and flood the lands of a lower proprietor, the upper proprietor, for so doing, is liable for the damages incurred." So that authority seemed to consider the two New York cases, in and of themselves, "the generally accepted view" that such a qualification of the rule existed; notwithstanding the fact that *McCormick* v. *Horan,* did not involve the question and merely referred to *Noonan* v. *Albany* by way of *dictum;* and notwithstanding the fact that the supreme court of Ohio, in *Mason* v. *Fulton County. Commissioners, ubi supra;* had quoted at length from the opinion of the supreme court of North Carolina, in *Mizell* v. *McGowan,* with seeming approval, and notwithstanding the fact that Mr. Freeman, in his note to *Mizell* v. *McGowan,* 85 Am. St. Rep. 705, said of

that case that it "undoubtedly establishes a contrary doc-
trine for North Carolina, and, in holding that a land-
owner in draining his land for a useful and proper purpose,
is not necessarily limited to the capacity of the natural out-
let, the opinion points out clearly that the test of the nat-
ural capacity of the stream cannot be safely or practically
applied."

So I contend that the qualification of the rule, as broad-
ly stated by the text writers cited, either, is not true, or,
if true, is applicable only to cases, where a single land-
owner, or a body of them, acting as one or jointly, drain
his or their lands into a natural water course independent-
ly of anybody else, and the water discharged by him or
them, irrespective of anybody else, increases the flow of
the watercourse beyond its natural capacity; that each
landowner along a natural watercourse, from its source
to its mouth, has the right to drain his land therein, and
that the qualification of the rule does not apply in cases
where the combined waters of all these owners, mingling
together, increases the flow in the watercourse beyond its
natural capacity.

There is nothing, in my judgment, contrary to that in
the cases of *Noonan* v. *Albany*, and *McCormick* v. *Horan*,
when applied to the facts in those cases. However, if mis-
taken as to that, then I say that the cases of *Mizell* v. *Mc-
Gowan*, 129 N. C. 93, also reported in 85 Am. St. Rep. 705,
and *San Gabriel Valley Country Club* v. *Los Angeles*, 9
Am. St. Rep. 1200, deny the existence of the qualification of
the rule, as stated by the text writers, and hold expressly
that the right to drain into a natural watercourse is not
limited to the natural capacity of the stream.

In *San Gabriel Valley Country Club* v. *Los Angeles
County*, 9 A. L. R. 1200, the supreme court of California
after quoting the reasons assigned by the North Carolina
court, in *Mizell* v. *McGowan* said: "The reason so stated
may be multiplied many fold. To them also may be added
the query: Why should there be any difference between in-
jury done by flooding, and injury done in any other man-

ner by an increase in the volume of the stream? If it be the injury alone which constitutes the wrong, why should a recovery not be permitted whatever form the injury takes? On the other hand, if it be not the injury alone which constitutes the wrong, why permit a recovery because of it, when it takes the form of flooding? The injury done by erosion, for example, is frequently much more serious than that done by flooding. It was undoubtedly so in the present case. No reason can be seen why if injury by flooding is actionable in such a case as the present, injury by erosion should not be so likewise. Yet, if the rule stated, established by the great weight of authority and based on strong considerations of public good, be subject to the limitation that the increased volume of the stream caused by drainage improvements above, otherwise lawful, do not cause injury by erosion, the rule does not in reality exist, since there can be no increase in the volume of the stream without increasing its speed, and consequently its erosive effects, and the doing of a theoretical injury, at least, to the banks past which it flows. Summing up the discussion, our conclusion, as we have stated, is that an improvement, for the purpose of the drainage and protection of lands above, does not give a lower riparian owner on the stream a cause of action, merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased, and his land is injured because of his failure to meet such increased burden; and further, that the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel."

But granting that the right of a single owner or of a collection of owners, acting together as one, to drain his or their land into a natural watercourse, is limited by the capacity of the stream, the limitation or qualification does not apply when the capacity of the stream is exceeded by the combined waters drained into it by various owners of lands acting separately and independently of each other.

Damages inflicted in the exercise of a legal right by any one cannot constitute a legal injury or wrong to another. Such is the instant case. *Indian Creek Drainage District* v. *Garrott*, 123 Miss. 301; *Jones et al.* v. *George et al.*, 126 Miss. 576; *San Gabriel Valley Country Club* v. *Los Angeles County*, 9 A. L. R. 1200; *Gray* v. *Reclamation District*, 174 Cal. 622; *Chicago, etc., Ry. Co.* v. *People ex rel. Drainage Commissioners*, 200 U. S. R. 561.

*Percy & Percy,* for appellees.

It is strenuously contended that the chancery court of Washington county is without jurisdiction in this cause and that suit should have been brought in the chancery court of Bolivar county which alone has jurisdiction. The venue of actions in this state is absolutely of statutory regulation. The venue of civil actions in the circuit court is prescribed by section 486 of Hemingway's Code. The venue of suits in the chancery court is prescribed by section 321 of that Code. In the *Archibald* v. *Miss. & Tenn. R. R. Company, Case,* 66 Miss. 424, this court holds that the common-law distinction between local and transitory actions does not exist here. The statute alone governs. The court in that case was considering exclusively the provisions of section 486. This suit is brought in Washington county under section 321.

The sole question determining the venue of this suit is whether it is a suit respecting real property in Washington county. If it is, it is properly brought in Washington county. If it is not a suit respecting real estate in Washington county, the court is without jurisdiction. The very basis of the litigation is, the real estate in Washington county is being damaged by the action of the appellants. The object of the suit is to restrain the appellants from committing acts which injure or damage land in Washington county. The suit has reference to, relates to, involves, affects, appertains to land in Washington county, all of which are involved in the statement that it is a suit

respecting land in Washington county. The dictionary defines respecting as having reference to; having a bearing upon, and this court discussing the language of the statute in *Boswell* v. *Wheat*, 37 Miss. 610, used this language: "It cannot therefore be said that the suit is not respecting or has no relation to the property levied on." The true rule as to municipal corporations is laid down in 5 McQuillin, section 2491.

In support of the author he cites *Baltimore* v. *Meredith's Ford, etc., Turnpike Co.*, 104 Md. 351, 19 R. C. L., section 338; *Robertson* v. *Thomas*, 118 Miss. 423; 19 Corpus Juris. 615. Drainage or reclamation districts have generally been held to be public or *quasi*-public corporations, and they have been termed 'public or governmental agencies,' although it has been denied that they are municipal corporations." See, also, *Witty* v. *Drainage District*, 126 Miss. 645, which cites a number of cases holding that drainage districts are not municipal corporations but *quasi*-public corporations. In the suit of *North Sterling Irr. Dist.* v. *Dickman*, 178 Pac. 559, it was vigorously urged that the action against such a corporation was inherently local and could only be tried in the domicile of defendant. The court held that the venue was definitely settled by the language of the Code (which like our Code did not specifically refer either to municipal corporations or drainage districts) and that there was nothing in the act which even by implication excepts *quasi*-public corporations from its provisions; that the bare fact that the defendant happened to be a *quasi*-municipal corporation could not abrogate the provision of the code as to venue. Furthermore, there was no intention upon the part of the legislature to except irrigation districts from the Code provisions relating to actions. This was a suit against an irrigation district located in Logan county, which permitted water to seep on and damage real estate located in Morgan county, and for the reason stated the court held that the action was properly brought in Morgan county. The case is precisely on all-fours with the case before this court. The attempt

here, as there, was simply to ingraft an exception upon the unambiguous language of the statute. Again, the Standard Encyclopaedia of Procedure, Vol. 25, p. 879, in construing the provision of Codes requiring actions for injuries to real property to be brought in the county in which the subject of the action is situated. *Drinkhouse* v. *Spring Valley Waterworks*, 80 Cal. 308, 22 Pac. 252; Farnham in 2 Farnham, 1864.

Before passing to a consideration of the main issue in the case, a word about the demurrer on the ground of there being a misjoinder of defendants. This ground is not stressed in the argument. No authorities are cited in support of it, and we assume that it is not relied upon by counsel. However, it seems well settled "that in a case where several wrongdoers act separately, they may be united as defendants in a suit to enjoin them from further injuring the plaintiff, but cannot in such a suit be subjected to a joint recovery for the damages occasioned." 20 R. C. L. 679. The rule is stated substantially in this language by all of the authorities, and we cite, merely for the purpose of illustrating, the following: 6 L. R. A. (N. S.) 1149; 22 American State 254; 52 American Rep. 763; *Telephone Company* v. *Williamson*, 101 Miss. 1; *Madison* v. *Ducktown Iron Co.*, 113 Tenn. 331; 14 Ency. Pl. & Pr. 1141; *Woodyear* v. *Schaefer*, 57 Md. 1, 40 Am. Rep. 419; *People* v. *Gold Run Mining Co.*, 66 Cal. 138, 4 Pac. 1152, 66 Am. Rep. 80; *Kingsbury* v. *Flowers*, 65 Ala. 479, 39 Am. Rep. 14.

Issues presented are: 1. Have the appellant districts the right to collect into ditches and canals the water falling in their territory and project same into Bogue Phalia in such quantities as to overtax the capacity of that stream and to flood the land lying within the appellee district?

2. Have they the right to adopt this plan of drainage when another plan is suggested by which they will secure better drainage and no injury be inflicted upon the lower riparian landowners?

First. The weight of the decisions, and practically all of the annotators and text-writers, favor the proposition that the right to drain surface water by ditches and canals

into a natural watercourse carries with it the limitation that you do not thereby overtax the capacity of the stream so as to flood the lower riparian landowners.

Second. That those cases which hold that the strict rule that you cannot increase the flow of a stream to the detriment of the lower landowners should be modified in the interest of good husbandry and the development of agriculture, yet hold that such modification must be with due regard to the rights of the lower landowners; that while it may be permissible to disregard their technical right to have the stream flow as it does in the course of nature, it is not permissible to so vary this rule as to inflict substantial damage upon them.

Third. The trend of all the decisions is that where there are two schemes of drainage feasible, one of which inflicts injury upon the lower proprietor and the other does not, the latter scheme must be adopted. What might be called the modified rule, is laid down in *Tillotson* v. *Smith,* 32 New Hampshire, 90, 64 Am. Dec. 355.

The New York courts have more frequently than the courts of any other state, been called upon to consider this question. In *Lumley et ux.* v. *Village of Hamburg,* 170 N. Y. Supp. 462, decided in 1918, the question involved was the right of the defendant to increase the flow of a watercourse so that its capacity was exceeded and the plaintiff damaged.

The court said: "It is well settled that such riparian owners are obligated to keep free and unobstructed the watercourses through their lands. It is also well settled that surface water may be collected and discharged in such a watercourse; but the right to discharge such surface water has the limitation that the same may not be discharged in such quantities as to overflow the banks of the watercourse." *Hentz* v. *City of Mt. Vernon,* 79 N. Y. Supp. 774; *Spiink* v. *Corning,* 70 N. Y. Supp. 143; *Noonan* v. *City of Albany,* 79 N. Y. 470, 35 Am. Rep. 540. Incidentally this case also stated a rule which would seem needs no authority, that a municipal corporation has no

greater right than an individual to collect surface water, etc. In *McKee* v. *Delaware, etc., Canal Co.,* 150 N. Y. 553, 21 Am. St. 740.

In the case of *McCormick* v. *Horan,* 81 N. Y. 86, 37 Am. Rep. 479, the New York court treats of the modification of the rule in the interest of agriculture. Supreme court of Massachusetts, in *Jackman* v. *Arlington Mills,* 137 Mass. 277. The rule is endorsed by the supreme court of Georgia in the case of *Grant* v. *Kuglar,* 81 Gal. 637, 12 Am. St. 348; *Martin* v. *Schwertley, et al.,* 40 L. R. A. (N. S.) 160; *Franz* v. *Jacobs* decided in 1919, 210 S. W. 163; *Jontz* v. *Northup,* 137 N. W. 1056; *Thompson et al.* v. *Andrews* decided in 917, 165 N. W. 9; *Callan* v. *G. M. Cypher Co.; Hughes* v. *Anderson,* 69 Ala. 280, 44 Am. Rep. 147; *Railroad* v. *Richardson,* 141 Pac. 1107, 42 Okla. 457; *Miller case,* 68 Miss. 760; *Lackey case,* 77 Miss. 881; *Harvey case,* 111 Miss. 835; 2 Farnham on Waters, 969; 27 R. C. L., page 1156; 40 Cyc. 648, 85 Am. St. Rep. 705, et seq.; *Holman* v. *Richardson,* 115 Miss. 169.

Without attempting to review in detail all of the decisions relied upon by counsel for appellants, we yet wish to say a few words about those principally relied upon. The three chief cases cited and quoted from by counsel, and they are the outstanding cases on that side of the controversy, are: *San Gabriel Val. Country Club* v. *Los Angeles County,* 9 A. L. R. 1200; *Maben* v. *Olsold,* 175 N. W. 512; *Mizell* v. *McGowan,* 85 Am. Rep. 705. No one of these cases presents any such state of facts. *Wharton* v. *Stevens,* 84 Iowa, 638, 44 N. W. 906, 35 Am. Rep. 296; *Maben* v. *Olson, Obe* v. *Pattat,* 151 Iowa, 727, 130 N. W. 905.

As to the case of *Mizell* v. *McGowan,* 85 Am. Rep. 705, *supra,* the decision is a short one. The basis of it is the difficulty of application of the rule that the capacity of a channel must not be overtaxed. No single authority or textwriter is quoted in support of the decision and as stated by Freeman in his note to the case; it is contrary to the weight of authority. This case of *Mizell* v. *McGowan* came before the supreme court of North Carolina in 1897

and is reported in 26 S. E. 783. The court there discussed the reasons influencing the decision, recognized that it was dealing with a difficult and delicate question and in reality based the decision upon the peculiar topography of the state. The fact that hundreds of thousands of flat surface swamp lands, which cannot be relieved of the ordinary waters, and made useful for living and cultivation, without artificial canals or ditches leading into some creek or river, had been recognized by the state and certain drainage and mill acts passed to meet the conditions.

We submit that the decree of the lower court overruling the demurrer should be sustained.

HOLDEN, J., delivered the opinion of the court.

The suit is by bill in equity seeking to enjoin appellant drainage districts, upper landowners on the Bogue Phalia, in Bolivar county, from making certain drainage improvements whereby the surface waters from their lands would be collected and discharged into the Bogue Phalia, a natural watercourse, in excess of its capacity, causing it to overflow the lands of appellee drainage districts, lower owners along the Bogue Phalia in Washington county. The appeal is from a decree overruling the demurrer of the eleven defendant drainage districts.

The determining question in the case is, whether or not the upper, or dominant, landowners upon a natural watercourse may artifically collect and discharge the surface waters from their lands into the natural watercourse, in good husbandry and in furtherance of agriculture, in excess of the capacity of the stream, thereby flooding and damaging the lands of the lower, or servient, owners bordering on the natural watercourse.

The exact question is new in this state, and is difficult of solution because of the unusual and singular situation to be dealt with in the case before us.

A brief statement of the case, sufficient to understand the decision, is as follows: Bogue Phalia drainage district,

and the owners of about one-third of the lands embraced
therein, filed their bill to restrain drainage district No. 10
of Bolivar county, and ten other separate drainage dis-
tricts in that county, from draining the lands embraced in
their respective districts into the Bogue Phalia, which is
a natural watercourse, about eighty miles long, having its
source in Bolivar county, and flowing southerly through
that county, and on through Washington county, to a point
about eight miles north of the southern limits of the latter
county, turning from the said point easterly and north-
easterly for about eight miles, where it empties into the
Sunflower river, though, on a direct line from the point
where it turns easterly to the Sunflower river, it is about
four miles.   It and its tributaries drain about four hun-
dred thousand acres of land, and said stream and its tribu-
taries are the only natural drainage of said land.

Bogue Phalia drainage district was organized in 1913,
extending from the north limits of Washington county, to
within a few miles of the southern limits of said county,
and embraces about one hundred fifty-two thousand acres
of land on both sides of said Bogue Phalia, while all of
the appellant drainage districts were organized under the
laws of 1912, as amended by the laws of 1914, in Bolivar
county, and embrace about two hundred twenty-seven thou-
sand acres of land, of which said Bogue Phalia is the nat-
ural drainage.   At the time this suit was brought, the ap-
pellant drainage districts in Bolivar county had adopted
their system of drainage, all leading into the Bogue Phalia;
the lands therein had been assessed, and the assessments
approved; bonds for than one million five hundred thou-
sand dollars had been issued; taxes in excess of three mil-
lion dollars had been levied; and a large part of the work
had been done.

Three of appellant drainage districts in Bolivar county
are on the west side of Bogue Phalia, and the other eight
are on the east side thereof, and all of them are north of
appellee Bogue Phalia drainage district and the lands em-
braced in the Bogue Phalia district constitute about thir-

ty-eight per cent. of the acreage naturally drained by said stream, while the lands embraced in the districts in Bolivar county constitute about sixty-two per cent. thereof.

The complainants below alleged, in substance, that, prior to the organization of the Bogue Phalia drainage district, many thousands acres of land of the lower owners were frequently overflowed by flood waters from said Bogue Phalia, that this condition was increased, as a result of the organization of Bogue Hasty drainage district in Bolivar county and the drainage of its lands into the Bogue Phalia, and by reason of a cut-off in the bend of the Bogue to accelerate the flow thereof; that in consequence thereof, and for the better improvement of the lands therein, the Bogue Phalia drainage district was organized; that it adopted a system of drainage designed by an eminent engineering firm, which had the effect to afford better drainage of the lands embraced therein, perhaps than any other body of lands in the Delta; that, as a means of relieving the lower reaches of the Bogue Phalia, various ditches and canals were dug leading into the Sunflower river, and among them a very large canal or ditch, known as ditch No. 12, from the Bogue Phalia to Sunflower river, with the expectation of diverting from the Bogue about two-thirds of the water flowing therein for the relief of the lower reaches of the Bogue; that the cost of construction of its canals and ditches, cleaning out Bogue Phalia, and completing its system of drainage, amounting to about seven hundred fifty thousand dollars, of which said ditch No. 12, diverting water from Bogue Phalia to Sunflower river, cost in excess of three hundred thousand dollars; that many thousands of acres of land have been brought into a very high state of cultivation by means of the completion of said drainage system; and that more than seventy-five per cent. of the lands embraced within the said district are in a high state of cultivation.

The bill complains of said district No. 10 in Bolivar county and its contractor, that they intend to drain the lands embraced in said district into the Bogue Phalia,

through and by means of enlarging and deepening Knox Bayou, a natural watercourse which flows through said district No. 10 and empties into the Bogue Phalia, and by means of ditches leading into said Knox Bayou; that the consequence of which, if done, will be to increase the flow of water in Bogue Phalia beyond the capacity of said stream, and will increase the flood level in the lower reaches of the Bogue Phalia from one to three feet, whereby many thousands of acres of land in said Bogue Phalia district, presumably near the mouth of the Bogue, will be subjected to disastrous inundation several times each year, according to the rainfall, and would render futile and ineffective the splendid drainage system of the Bogue Phalia drainage district; that the increase in the flood level of the Bogue and the flow of water therein beyond its capacity, will result, through the scheme of drainage through Knox Bayou, as proposed by said district No. 10, from draining into the Bogue, "water which now evaporates or is taken up by the land on which it falls without reaching the Bogue; and, by increasing greatly the flow of surface water which now finds its way to the Bogue, by means of collecting such surface water into ditches and canals and projecting it into the Bogue."

In their amended bill against all of the eleven appellant drainage districts in Bolivar county, the appellees, complainants below, reaffirmed the foregoing facts, and further alleged, in substance, that if all of said districts, defendants' below, be allowed to drain their lands into Bogue Phalia, as they contemplate, it is absolutely certain that said Bogue is insufficient in channel capacity to carry off the water which now finds its way therein, when the same is increased, as it will be from the combined drainage of water therein by all of the said districts; that the effect of the completion of the drainage system of said districts will be to increase, by not less than three feet, the flood height of water in the Bogue; that, as the result of that, not less than thirty-five thousand acres of land in the Bogue Phalia drainage district will be subjected to dis-

astrous inundation, several times during the year, according to the rainfall, but sufficient to destroy their value as farm lands, and the drainage of all land in said district, including that not actually overflowed, would be seriously damaged and rendered of little value.

It is charged further that the appellant drainage districts have proceeded to drain their surface waters into the Bogue Phalia on the theory that they have the legal right to do so, regardless of the effect such drainage would have in flooding the lands along the lower reaches of the Bogue; that, while the exact damage that may be done by each of said districts cannot be definitely ascertained, the combined damage will be overwhelming and destructive to complainants' lands; and, not only that, the Bogue will afford inadequate drainage for all parties concerned, both complainants and defendants, in that it will simply be a ditch taxed belond its capacity, after millions of dollars have been expended in an effort to secure drainage.

The bill seeks to enjoin appellants from the construction of additional canals leading into the Bogue, and to compel the filling up of those already constructed which flow into the Bogue, or, if mistaken in that belief, then that the canals be restored to the condition in which they were at the time of the filing of the amended bill.  The demurrer of the appellants, admitting the truth of the allegations of the bill, contends that the chancery court of Washington county has no jurisdiction of the cause, and that the bill shows no equity upon its face.

We shall first dispose of the question of jurisdiction. The contention of appellants is that the venue of the action was in Bolivar county instead of Washington county, because the suit is one "respecting real property" in Bolivar county, where defendants reside, and therefore the chancery court of that county has sole jurisdiction.

The opposite position of appellees is that, under section 321, Hemingway's Code (section 561, Code of 1906), the suit was properly brought in Washington county, where the land directly affected is situated.  We think the chan-

cery court of Washington county had jurisdiction of the case. This seems to be the most reasonable construction and application of the statute, and is probably the better view.

It will be observed that, on the main question, we are confronted with the serious and decisive inquiry of whether the upper landowners on a natural watercourse may be deprived of their right of drainage into the natural and only outlet, in pursuance of good husbandry and in the reasonable use of the stream, where the drainage is of surface waters in artificial channels into the watercourse in excess of the capacity of the stream, thereby flooding and damaging the lower riparian owners; or whether the upper owner may exercise his right to drain into the natural watercourse under such circumstances, and the injury to the lower owner resulting therefrom is *damnum absque injuria.*

The difficult situation is this: The upper owners on the watercourse have the natural and legal right to drain their surface waters into the watercourse; but it is equally true that the law prohibits an adjoining owner of land from collecting his surface waters and discharging them in a body upon the adjoining owners. Thus it will be seen that the conflicting rights of the upper and lower owners, or adjoining owners, are sharply presented for solution in this case.

We find no trouble in declaring the law to be in this state that the adjoining owner cannot discharge his collected surface waters upon his neighbor; and there also is no doubt that the law gives the right to the riparian owner to collect and discharge surface waters from his land, in good husbandry, into the natural watercourse, when such right is reasonably exercised.

But whether the upper owner may drain his surface waters into the watercourse in excess of its capacity, and thereby damage the lower owner, which is in effect, by indirect means, the collection of drainage waters and dis-

charging them upon his adjoining neighbor as prohibited by the law of this state, is one of the serious phases of this case.

It will be noted there are eleven drainage districts that, acting separately and distinctly, propose to drain into the watercourse, and it does not appear that the drainage waters from any single one of these districts would exceed the capacity of the stream, but the charge is that the combined waters from all of the districts would exceed the capacity of the watercourse. It is not disclosed how many, but one or more of the districts could drain into the outlet before the channel would become inadequate to carry the water away without flooding the owners in the lower reaches of the stream. It does not appear what amount of water is contributed by the different districts, nor at what point along the eighty miles of the watercourse the flooding would begin when the combined waters are discharged into the stream.

Our conception of the case is that the owners of the thirty-five thousand acres of land in the lower reaches of the watercourse are overflowed from the combined waters drained into the stream by the eleven separate districts on the watercourse in Bolivar county and by the owners on the stream in the upper part of Washington county, who are in the Bogue Phalia district, the complainants in this case.

Now the question arises, shall the rule be adopted in this state, dealing with such a situation respecting the vast fertile lands of the Delta, that the large number of upper landowners, owning millions of dollars worth of land, equal in fertility to that of the Nile, be deprived of the exercise of their natural and legal right to drain their lands into the natural and only watercourse, in pursuance of good husbandry and the promotion of agriculture, because the lower, or servient, owners will thereby be flooded and damaged?

Or shall this court adopt the rule, a rule of advancement and progress, that the dominant owner whose own inde-

pendent act of draining into the watercourse, which of itself is not in excess of the capacity of the stream, is not to be deprived of such legal right to the reasonable use of the water course because other landowners, separately and independently, discharge their collected waters into the stream, which combined with his exceed its capacity?

We do not think the rule in this state, prohibiting the adjoining owner from collecting his surface waters and discharging them upon his neighbor, is applicable in this case, because the discharge of the collected waters into the natural outlet here is but the exercise of the right of the riparian owner to reasonably discharge his surface water into the watercourse. But whether the upper owner may exceed the capacity of the stream and thereby damage the lands of the lower owner is a question that we must now decide.

We have no decision of our courts to govern us, and the authorities elsewhere are in conflict; the greater weight, in number of decisions, however, supports the principle that the upper owner is not unlimited in his use of the watercourse, and cannot increase the flow of the stream beyond its natural capacity to the injury of another. In other words, the majority of the courts hold, and the text-writers announce it as the accepted view, that the right of the upper owner to drain into the watercourse is qualified to the extent that the flow must not be increased beyond the capacity of the stream.

There is also a line of decisions announcing the opposite view that the right to drain into the outlet is unlimited; that the capacity of the stream may be exceeded, and the resulting damage to lower owners is *damnum absque injuria.* We shall refer to the decisions later on in this opinion.

If we follow the rule supported by the majority of decisions, that the right to discharge collected surface waters into a watercourse is limited by the provision that the capacity of the stream shall not be exceeded, we will have adopted a rule working a great hardship on the upper land-

owners along the Bogue Phalia and its tributaries for many miles, and will prevent the owners of these thousands of acres of land from improving and cultivating them, because they have no other outlet than the Bogue Phalia by which they may discharge the vast quantities of water of this watershed. It would, in effect, destroy the legislative policy as manifested in our drainage district laws of the state.

To so hold would mean that the owners of the land lying in the lower reaches of this eighty-mile water course would be able to prevent the use of the stream by all of the upper owners for drainage purposes in good husbandry. It would be to deny the use of the stream to the upper, or dominant, owner and give its entire use (a monopoly) to the lower, or servient, owner.

This rule, if followed by us, would mean that the lower owner may thus solely utilize the stream for drainage purposes, because the upper owners, acting separately and independently, in discharging their waters into the stream would, by coincidence, thereby increase the flow beyond the channel capacity, not by the discharge of a single landowner, or a single group of landowners, but by the combined waters of all the owners located above the appellee drainage district.

The logic of such a conclusion is that, because one of the upper owners has exercised his right to drain into the stream, which incidentally increased the amount of water beyond its capacity, all of the other owners must desist from using the watercourse. Or to put it in another way, the independent action of each upper landowner in the reasonable use of the stream for drainage purposes would result in a situation which would prohibit or deny to any or all of them its use.

To follow this rule urged by the appellee would be to destroy the right of the upper riparian owner to use the natural watercourse for reasonable drainage purposes, although his own independent use of it would not overtax the capacity of the stream, and such use by him alone would

be reasonable and proper. Is the upper owner to be deprived of his right to discharge water into the watercourse merely because others are exercising the same right, resulting in an overflow from the combined waters? If so, then he is deprived of a substantial property right, a right to drain into the natural watercourse as an incident to ownership of the land.

To follow the principle urged would be to make the lower or servient owner the dominant owner, and the upper owner the servient owner, a reversal of rights by virtue of the position of the owners. It would deny the upper owners the use of the means of drainage afforded by nature, appurtenant to the land, a property right, to drain it in good husbandry, for better health conditions and in promotion of agriculture; and in the particular case before us would result in destroying an immense quantity of fertile land and hinder progress and development of the Delta section of our state, and impose great hardship upon the appellants, and others in like situations. Furthermore would it not be impracticable to enforce the restraining order of the court?

Viewing the other side of the case, we realize that a decision in favor of the upper owners would also work a hardship upon the lower owners. Hardship in the case cannot be avoided. The position of the appellees, lower owners, is not without merit, and is supported by good authority. That the adjoining landowner, under the law of our state, is to be protected against the collected waters discharged upon him by his neighbor, certainly cannot be denied. And the lower riparian owner is to be protected in his rights to the reasonable use of the watercourse flowing through his land, and is ordinarily entitled to have the water flow as it should flow in its natural course, and not increased or diminished to his injury.

After a careful consideration of the difficult question presented, we have decided to follow that line of decisions which hold that the upper owner may reasonably drain his surface waters into the natural watercourse, in good hus-

bandry, and this right may be exercised by him without any qualification or limit; and if he thereby increase the flow of the stream beyond its capacity, which results in flooding and damaging the lower owner, such damage will be *damnum absque injuria;* damage without legal injury, for which no right of action will lie.

We think this is the better rule to adopt in our state, in view of the peculiar local conditions and topography to which the rule may be applied. We believe that in such a case where the upper or lower owner must necessarily suffer, it would be more reasonable and just to put the loss upon the lower owner, who, we may say, should have reasonably anticipated the drainage of the lands above him into the watercourse running through his land. The lower owners may have reasonably known that the upper owners would exercise their right at some time to drain their surface waters into the only watercourse available as an outlet.

The upper owners knew they had the right to drain their lands into the watercourse when they bought them, and could not have reasonably anticipated that a condition would arise, by reason of so many other owners draining into the stream, that would cause their use of the stream, in the exercise of their independent right, to exceed its capacity and overflow the lands below. Each upper owner, exercising independently his absolute right to drain into the watercourse, has done nothing himself to injure the lower owner, because his drainage alone would not exceed the capacity of the stream, and the fact, or coincident, that the other owners exercised their independent right to drain into the stream, should not result in depriving the individual owner of the right to the reasonable use of the stream for drainage purposes, though it seems a contrary view is expressed in *Warren* v. *Parkhurst,* 186 N. Y. 45, 78 N. E. 579, 6 L. R. A. (N. S.) 1149, 9 Ann. Cas. 512, which case differs from the one at bar in that there was a combined pollution of the stream by upper owners.

The combined waters of all of the upper owners which resulted in overtaxing the capacity of the stream was but a natural result of the exercise of the right of each owner to use the stream for his separate benefit. The servient owner below ought not to be allowed to complain of the natural result following the individual and separate rights of the upper owners to drain into the watercourse.

Every lower owner under the circumstances may expect such natural result. It is observed and experienced on the larger waterways of our country. And it appears to us the rule would be wholly unjust and unreasonable to say that one landowner, or several landowners, in the lower reaches of a long stream, could perpetually enjoin thousands of other upper landowners, located along the stream, from its reasonable use in draining surface waters into it, which would result in an overflow of the lower owners on account of the combined waters of the dominant owners of the stream and its tributaries. Moreover, the Bogue Phalia drainage district in the northern part of Washington county contributed drainage waters to the stream which may have, according to the record, so increased the flow that when it reached the owners of the lower reaches the capacity of the channel was exceeded and caused the overflow. It is not shown where, at what point, or what particular discharge of waters proximately caused the channel to overflow.

The leading case supporting the view expressed above is *Mizell* v. *McGowan,* 129 N. C. 93, 39 S. E. 729, 85 Am. St. Rep. 705, which case has been followed by other courts. This case announces the rule expressly that the right to drain into a natural watercourse is not limited to the natural capacity of the stream. We think this principle is sound, and prefer to follow it instead of that line of decisions holding to the contrary. *San Gabriel* v. *Los Angeles,* 182 Cal. 392, 188 Pac. 554, 9 A. L. R. 1200.

The leading case holding the opposite view, that in draining into the watercourse the flow must not be increased beyond its natural capacity, is *Noonan* v. *Albany,*

79 N. Y. 470, 35 Am. Rep. 540, which is cited by the text-writers and followed by *McCormick* v. *Horan,* 81 N. Y. 86, 37 Am. Rep. 479; *Jackman* v. *Arlington Mills,* 137 Mass. 277; and *Hicks* v. *Owensboro,* 6 Ky. Law Rep. 226. The rule is also announced in *Tillotson* v. *Smith,* 32 N. H. 90, 64 Am. Dec. 355; *Hentz* v. *City of Mt. Vernon,* 78 App. Div. 515, 79 N. Y. Supp. 774; *Lumley* v. *Village of Hamburg,* 181 App. Div. 441, 170 N. Y. Supp. 462; *Spink* v. *Corning,* 61 App. Div. 84, 70 N. Y. Supp. 143; *McKee* v. *Delaware Co.,* 125 N. Y. 353, 26 N. E. 305, 21 Am. St. Rep. 740; *Grant* v. *Kuglar,* 81 Ga. 637, 8 S. E. 878, 3 L. R. A. 606, 12 Am. St. Rep. 348; *Martin* v. *Schwertley,* 155 Iowa, 347, 136 N. W. 218, 40 L. R. A. (N. S.) 160; *Franz* v. *Jacobs,* 183 Ky. 647, 210 S. W. 163; *Thompson* v. *Andrews,* 39 S. D. 477, 165 N. W. 9; 2 Farham on Waters 969.

It seems that the rule followed in the above authorities was first announced in *Noonan* v. *Albany, supra,* and appears to have been followed and cited by a large number of the decisions rendered by other courts. The rule announced in that case, which has led the text-writers to say that it is the present accepted view, was based upon a state of facts somewhat different from the case at bar.

The *Noonan* v. *Albany Case, supra,* was one where the city of Albany, by means of sewers and the manner of grading a certain street, concentrated the surface water and sewage of a large territory, and discharged it in *one body* (italics), at the junction of two streets, into a *ravine or rivulet* (italics). It passed after its discharge over ground used as a dumping place for refuse, and down a declivity until it reached the valley or bed of the ravine, and flowing easterly reached the premises of the plaintiff, and having no sufficient outlet flooded plaintiff's lot and deposited thereon the filth carried by the sewers, and the sand and dirt washed down by the water as it passed over the dumping ground.

It will be observed that the size of the water course in that case was small, with very little carrying capacity, and the collected waters there were discharged in one body in-

to this small channel; that is, the water was discharged in one body at one point, and the channel was obviously incapable of carrying the water away without overflowing the lower owner.

In the case before us the watercourse appears to have been of good size and sufficient capacity to ordinarily drain the watershed comprising about six hundred square miles; and the further distinction is that the water in the New York case was discharged in one body at one point into the channel, whereas here the discharge of the drainage into the watercourse is not in one body but by many different ditches, canals, and drains entering the stream at various and different points.

The cases may be distinguished on the theory that, in the New York case, the discharge of the water in one body was such as to cause reasonable anticipation that it would exceed the capacity of the small channel and overflow the lower owners, but in the instant case the water is discharged at different points and in separate quantities, not by one person, nor in one body, but by many landowners acting separately and independently in the exercise of their right to drain into the natural watercourse of the watershed.

However, we do not rest our decision in this case upon the ground that there is a distinction in principle in the two cases. The principle announced may apply in both cases, but for the reasons given by us we have declined to follow the rule announced in the New York case.

It is true the appellees are entitled to the benefit of the rule that water should flow as it is want to flow, but we think with this exception or qualification, that it may be increased by a riparian owner who, in the reasonable exercise of his right of drainage, discharges into the stream in excess of its capacity.

The complainant's bill, also charged that the defendant below could avoid the disastrous consequences to complainants by constructing a cut-off through what is known as Porter's bayou to the Sunflower river, which "could be

constructed at a cost not prohibitive." We see no merit in the point, for the reason the allegation is not sufficient to bring the appellants within the rule that, where there are two reasonable ways of constructing, one of which would damage the appellee and the other do him no injury, the latter plan should be followed. The naked allegation that the other method "could be constructed at a cost not prohibitive" is not sufficient to entitle the appellee to the benefit of the rule.

In view of the above conclusion it follows that the decree of the lower court must be reversed and the bill dismissed.

*Reversed and dismissed.*

SYKES, J., takes no part in this case.

ETHRIDGE, J. I concur in the opinion of the court (except I doubt the jurisdiction of the chancery court of Washington county to entertain the suit), because I understand that the case of *Indian Creek Drainage District* v. *Garrott*, 123 Miss. 309, 85 So. 312, and *Jones* v. *George*, 126 Miss. 576, 89 So. 231, hold that section 17 of the state Constitution has no application to the drainage districts in so far as concerns damages not flowing from a taking, and that when the legislature confers a right on a drainage district, but makes no provision for damages, the exercise of such rights by such district is damage without legal injury, so far as damages flowing collaterally, or to persons not in the district, are concerned. I dissented in both of these cases and set forth to the best of my ability my reasons therefor, and in the case of *Jones* v. *George*, drew a distinction between a public corporation or *quasi*-corporation and a private individual in the exercise of the rights of drainage and leveeing. At page 592 of 126 Miss., at page 237 of 89 So., I said:

"There is also, in my opinion, a material difference between the right of an individual or a private corporation as riparian owner, and the rights of the public corpora-

130 Miss.—51

tions, which must have the power and prestige of the state to exercise rights. An individual must necessarily be limited, both in the extent of the construction and in the amount of cost involved in constructing a levee; whereas a drainage district, as a corporation, has multiplied power in this field. An individual is restricted by a decent regard for his neighbors' rights and with a wholesome fear of his neighbors' anger, in case he goes too far in inflicting injury upon his neighbor; but the state may create a public corporation against which the individual is powerless, and it may and frequently does wholly ignore a citizen's rights or his feelings in the work it may do. A corporation exercising the power of eminent domain is exercising a public power, which, in the nature of things, can only be exercised for the public good, and no construction should be adopted which impairs the provision of the Constitution for compensation or damages for the taking of property for the public good."

But for the cases above named I would be of the opinion that the appellee was entitled to damage, but I regard the decisions as controlling on this question and must yield my private judgment to the solemn decision of the court, until that decision is attacked and modified or overruled in the legal method. I never had any doubt that the individual landowner had a right to drain his lands into a natural watercourse, even though so doing might overflow the banks of the stream and damage a lower owner. I think the lower owner takes his land subject to the right of the upper owner, and his remedy for such a situation is to dredge, or channel, or levee against such overflow waters, or construct artificial spillways or conduits to care for the surplus waters. To hold otherwise, in my judgment, would prevent the proper use of the lands of the state, or a good part of them, for legitimate purposes. I recognize the difference between the amount of damage resulting from a public corporation, or drainage district, and that which would flow from an individual drainage project. I think the drainage laws ought to be so shaped

that injury would be cared for, but this is a matter which the court cannot properly take care of. It is to be hoped that the legislature at its next session will deal with the subject in such manner as to get the benefits of the drainage systems, and make proper compensation for such injuries as necessarily flow from their creation to other owners. Before a district is created, the whole benefits and burdens should be considered, and unless the benefits, so considered, exceed the damages, so considered, it should not be created.