[Civil No. 4574. Filed June 30, 1944.]

[150 Pac. (2d) 81.]

SOUTHERN PACIFIC COMPANY, a Corporation, Appellant, v. CLOTILDA PROEBSTEL, Appellee.

Messrs. Knapp, Boyle & Thompson, of Tucson, Arizona, and Mr. Lawrence L. Howe, of San Francisco, California, for Appellant.

Mr. Glenn Copple and Mr. Wm. H. Westover, of Yuma, Arizona, for Appellee.

FAIRES, Superior Judge.—Appellant, Southern Pacific Company, hereinafter called defendant, appeals from a money judgment rendered against it in the Superior Court of Yuma County in favor of appellee, Clotilda Proebstel, hereinafter called plaintiff, for land and crop damages caused by a flood in what is known as Coyote Wash during August of 1941. The action was tried before a jury and at the close of evidence defendant moved for an instructed verdict in its favor, which motion was denied, and thereafter the jury returned its verdict for the plaintiff. Following the entry of judgment for plaintiff the defendant filed its motions to set aside the verdict and for judgment in its favor, together with separate motion for new trial, which motions were denied, following which this appeal was taken.

Plaintiff alleged in her amended complaint that on or about the 25th day of July, 1941, defendant constructed a large ditch south of its line of railroad near Wellton, Arizona, extending about one mile in length from a point on an arroyo commonly known as Coyote Wash south of its railroad, the effect of which so changed the drainage of the surrounding country as to increase the flow of Coyote Wash as it ran near and through her land whenever a heavy rain storm would occur; that as a result of said construction by the defendant far greater quantities of water than would normally flow upon the land of the plaintiff from the wash would be precipitated upon her land. Plaintiff also alleges that subsequent to this construction a great torrent of water swept down Coyote Wash and upon and over her land and destroyed the crops, and so injuring her land as to require re-grading, and that but for the ditch so constructed by defendant none of such damage would have occurred.

Plaintiff's land lies approximately one mile north of Wellton, which town, lying east of Yuma, is intersected by the east-west mainline tracks of defendant, and the paralleling Yuma-Phoenix highway. Plaintiff's land is cut through approximately from south to north by the natural channel of Coyote Wash, which has a general fall of twenty-five feet to the mile. This wash serves as a natural drain for the watershed to the south of Wellton, which embraces 302 square miles. Storm and flood waters of this watershed drain into Coyote Wash, which as a natural watercourse receives and then conducts them in a general northerly direction to Wellton, where they pass under the railroad bridge; thence through a 170 foot highway ditch, and still continuing northerly are then discharged upon plaintiff's land. Coyote Wash extends a distance of approximately 24 miles south of Wellton, and its continuity as a natural watercourse can be followed. Its width varies from 100 to 400 feet, and its depth ranges from three to eight feet. At a point on Coyote Wash just above her cultivated land plaintiff, several years ago, constructed an unreenforced earthwork dike, extending from bank to bank, for the purpose of forcing the waters to flow to the west and by-pass her farm. At least on one occasion prior to the constructing of defendant's dike, and before the litigated flood, her dike had failed to withstand the waters of Coyote Wash, with resulting damage to her downstream farming land. As rebuilt just before the flood, over which this suit arose, plaintiff's dike was in an unfinished state and, according to some of her own witnesses, had not been adequately designed or constructed.

Defendant's dike or embankment, built in July of 1941, is 3,517 feet in length and varies from five to eight feet in height. The southerly tip is more than a mile south of Wellton and from such point it extends

northeasterly to a point on the westerly bank of the main channel of Coyote Wash to a point approximately two miles upstream from plaintiff's dike. In constructing this dike defendant intercepts numerous channels, all of which, within a distance of two miles upstream, stem in a northwesterly direction from Coyote Wash.

On August 9, 1941, following the completion of defendant's dike there was a heavy rainfall in the area south of Wellton, resulting in Coyote Wash reaching flood stage. Defendant's dike intercepted and cast back into Coyote Wash such part of its flow as had escaped from the main channel. When the flood waters of Coyote Wash reached plaintiff's own dike it collapsed and allowed the stream water to come upon plaintiff's land with resulting damage.

This litigated flood was one of a total of three described by the witnesses; the first and largest of these three floods occurred in 1931. While there was conflict in the testimony as to the exact date of the second flood, it occurred about December, 1940, or January-February, 1941.

Defendant does not challenge the amount of the verdict and judgment but confines its attack to the basic proposition that plaintiff failed to establish breach of duty on the part of the defendant, such as would render it liable in damages to the plaintiff.

The exact question here involved in this case is new in this state, and the water law in Arizona furnishes no precedent for this appeal. This court has never been called upon to adjudicate the character of water escaping through or over the banks of a stream, nor to set out what, if any, defensive steps may be employed in halting its invasion. Insofar as the water law of Arizona is concerned, the prohibitions found in the cases adjudicated are against:
a. The obstruction of surface waters without provid-

ing sufficient outlet and, b. The accumulation of surface waters in large quantities, followed by its conduct through an artificial ditch in a direction where it never before flowed to ultimate discharge upon the land of another.

It is the defendant's position that the waters in Coyote Wash were flood waters, while it is the contention of plaintiff that they were surface waters. Hence, the vital question for determination here is the character of these waters involved in this litigation. The terms "surface water," "stream water," and "flood water" each differs in fact and has a different significance in law. *Sam Gabriel, etc.,* v. *Los Angeles County,* 182 Cal. 392, 188 Pac. 554, 9 A. L. R. 1200 (cited with approval in *City of Globe* v. *Shute,* 22 Ariz. 280, 196 Pac. 1024, 1027), in which latter case the Court said:

"The distinction between the present case and the decisions cited by counsel for the municipality is well defined. None of these decisions were concerned with the diversion of the waters of a natural stream by means of an insufficiently constructed artificial channel or waterway. They are all cases concerning surface waters."

The distinguishing physical characteristics are aptly defined in *Mogle et al. v. Moore et al.,* 16 Cal. (2d) 1, 104 Pac. (2d) 785, 789.

"Surface waters are defined as waters falling upon and naturally spreading over lands. They may come from seasonal rains, melting snows, swamps or springs, or from all of them. Surface waters consist of surface drainage falling on or flowing from and over a tract or tracts of land before such waters have found their way into a natural watercourse. 26 Cal. Jur. p. 279, and cases cited."

While stream waters are not involved in this appeal, it will illuminate the discussion to quote the definition found in *Mogle et al* v. *Moore et al., supra:*

. "A .stream is a watercourse having. a .source and terminus, banks and channel, through which waters flow, at least periodically. Streams usually empty into other streams, lakes, or the ocean, but a stream does not lose its character as a watercourse even though it may break up and disappear. (Citing case.) Streams are usually formed by surface waters gathering together in one channel and flowing therein. The waters then lose their character as surface waters and become stream waters. (Citing cases.) As we have observed, a continuous flow of water is not necessary to constitute a stream and its waters stream waters. (Citing cases.)"

 Flood waters are thus correctly described in 26 Cal. Jur. 280, *supra:*

"Flood waters are distinguished from surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term 'flood waters' is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gully or depression does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse."

 It is thoroughly settled that flood waters escaping from a stream are not surface waters and do not lose their character as flood waters while flowing wild over the country. In *Horton* v. *Goodenough,* 184 Cal. 451, 194 Pac. 34, 37, it was said:

" . . . The waters are plainly flood waters breaking out of their channel and running wild, and as such each property owner threatened has the right to protect himself against them as best he can, under the authority of the decisions we have already cited, the most notable of which is *Lamb* v. *Reclamation District, supra* (73 Cal. [125] 126, 14 Pac. 625, 2 Am. St. Rep. 775). The waters are not surface waters in the

technical sense, for they have already been gathered into a stream whence they have escaped.''

A similar rule is announced in *LeBrun* v. *Richards,* 210 Cal. 308, 291 Pac. 825, 828, 72 A. L. R. 336, with the added remark that ''flood waters are those which escape from a stream or other body of water and overflow the adjacent territory.''

▪ The rules governing the right to obstruct the flow of the ''surface waters'' and ''flood waters'' with which we are here concerned are clearly set forth in *Horton* v. *Goodenough, supra,* as follows:

'' . . . First, one has no right to obstruct the flow onto his land of what are technically known as surface waters. *Heier* v. *Krull,* 160 Cal. 441, and authorities therein cited at page 444, 117 Pac. 530. But by 'surface waters' are not meant any waters which may be on or moving across the surface of the land without being collected into a natural watercourse. They are confined to waters falling on the land by precipitation or rising thereon in springs. Putting it conversely, they do not include waters flowing out of a natural watercourse, but which yet were once a part of a stream and have escaped from it, 'flood waters,' in other words. (Citing cases.) Second, one has the right to protect himself against 'flood waters,' that is, waters of the character last described, and for that purpose to obstruct their flow onto his land, and this even though such obstruction causes the water to flow onto the land of another. (Citing cases.) Third, one may not obstruct or divert the flow of a natural watercourse. But by a 'watercourse' is not meant the gathering of errant water while passing through a low depression, swale, or gully, but a stream in the real sense, with a definite channel with bed and banks, within which it flows at those times when the streams of the region habitually flow. (Citing cases.)''

Plaintiff testified that the amount of water diverted into Coyote Wash by the construction of the ditch and dike was from forty to fifty per cent of the nor-

mal flow. However, plaintiff does not contend, nor was proof offered, that the water-carrying capacity of Coyote Wash was exceeded, but rested her case upon the allegation that the construction of defendant's dike changed the drainage of the surrounding country as to cause greater drainage into and greater flow of water down Coyote Wash whenever a rain storm would occur. She further alleged that great torrents of water than would normally flow upon the land of plaintiff from the wash were precipitated upon it to her damage.

 While the right of one to drain into a water course cannot be challenged, there are conflicting lines of decisions as to whether in so doing he may exceed the storm-carrying capacity. Under the uncontradicted facts contained in the record this court is not called upon to decide which of the divergent doctrines is to be adopted in Arizona. A careful examination of the evidence in the case is convincing that the waters intercepted by defendant's dike were not "surface waters," but "flood waters"; that though obstructing the escaping waters by dike the defendant did not change their natural course; nor did the defendant conduct the waters by artificial means to the plaintiff's premises. *Maricopa County, etc.,* v. *Roosevelt Irr. Dist.,* 39 Ariz. 357, 6 Pac. (2d) 898. A careful examination of the Arizona Irrigation District cases, *Roosevelt Irr. Dist.* v. *Beardsley, etc.,* 36 Ariz. 65, 282 Pac. 937, 939, *Maricopa County, etc.,* v. *Roosevelt Irr. Dist., supra,* demonstrates that this court was not passing upon waters which had broken away from or escaped the main channel of a watercourse, but was dealing with "surface waters." Hence, these cases cannot serve as legal precedent in determining the character of the waters this court is now called upon to consider. In *Roosevelt Irriga-*

*tion District* v. *Beardsley, etc., supra,* Judge McAlister, speaking for the court, said,

"Even though it be true that defendants could have thrown up an embankment and prevented the water from flowing on their premises, this did not authorize them to collect it in an artificial channel and cast it against plaintiff's property, for 'there is a manifest distinction between casting water upon another's land, and preventing the flow of surface water upon your own.' *Barkley* v. *Wilcox,* 86 N. Y. 140, 40 Am. Rep. 519." *Hutchings* v. *Wabash Ry. Co.,* 224 Mo. App. 1124, 33 S. W. (2d) 147; *Gibson* v. *Duncan,* 17 Ariz. 329, 152 Pac. 856.

The defendant in this case has not collected the waters upon its right of way and discharged the same immediately upon plaintiff's land; it has merely raised its own premises so as to dike against and prevent the flow of water thereon. It has protected itself and prevented invasion of its premises of the flood waters of the stream. If, thereby, the waters which are turned back and prevented from flooding over its right of way damage the lands of the plaintiff, the case is one of *damnum absque injuria.* Defendant has done nothing further than to exercise its common law right of protection against flood waters. It is presumed that plaintiff may do the same.

Among the cases cited by plaintiff in her brief from other jurisdictions as controlling is *State* v. *Hiber,* 48 Wyo. 172, 44 Pac. (2d) 1005. This case involved the question whether the impounded flow was "surface waters" or "stream waters." Stream water is not here involved. Another case relied upon by plaintiff, *Los Angeles Cemetery Association* v. *City of Los Angeles,* 103 Cal. 461, 37 Pac. 375, is distinguished in *Sanguinetti* v. *Pock,* 136 Cal. 466, 69 Pac. 98, 89 Am. St. Rep. 169, a later California case, by denying applicability, and escaping waters were held to be "flood

waters." See *San Gabriel, etc.,* v. *Los Angeles Co.,* 182 Cal. 392, 188 Pac. 554, 9 A. L. R. 1200. Plaintiff cites and relies upon *LeBrun* v. *Richards, supra,* as authority for the proposition that the escaping waters involved in this appeal were "surface waters." That court in defining surface waters and distinguishing them from flood waters said:

" . . . 'Putting it conversely, they do not include waters flowing out of a natural watercourse, but which yet were once a part of a stream and have escaped from it, "flood waters," in other words. . . . Second, one has the right to protect himself against "flood waters," that is, waters of the character last described, and for that purpose to obstruct their flow on to his land, and this even though such obstruction causes the water to flow on to the land of another. . . . ' "

This same language is restated and adopted in *Mogle* v. *Moore, supra,* which distinguishes the decisions of California dealing with surface waters and those pertaining to flood waters. See also *Poole* v. *Sun Underwriters, etc.,* 65 S. D. 422, 274 N. W. 658, and *Indian Creek Drainage Dist.* v. *Garrott,* 123 Miss. 301, 85 So. 312.

Among other cases cited by plaintiff: *Maricopa County Municipal Water Conservation District, etc.,* v. *Southwest Cotton Company, etc.,* 39 Ariz. 65, 4 Pac. (2d) 369, is not in point for it defines a watercourse and relates to "stream waters." *City of Tucson* v. *Dunseath,* 15 Ariz. 355, 139 Pac. 177, has no application to the facts in this case as it is one clearly involving "surface waters."

*Kroeger* v. *Twin Butte R. R. Co.,* 14 Ariz. 269, 127 Pac. 735, Ann. Cas. 1914A, 1289, is a case where no defensive dike was involved; nor was any contention made that the intercepted water was other than "surface waters."

In comparing the foregoing cases it must be kept in mind that in the case before us the water which reached the lands of the plaintiff was not conducted there through artificial means, nor was the water discharged immediately upon her premises by the defendant but reached her lands in the bed of a natural watercourse.

· On the proposition of law that one whose property is threatened to be invaded by flood can defend against it by the use of ditch or dike, and for any damages resulting therefrom he is not liable if the results of his ditch or dike are merely to augment the flow of a stream constituting natural drainage for the basin wherein the invading water had its origin, the defendant has cited a host of cases from many jurisdictions, including leading cases—*Board of Drainage Com'rs* v. *Board of Drainage Com'rs.*, 130 Miss. 764, 95 So. 75, 28 A. L. R. 1250, *San Gabriel Valley Country Club* v. *Los Angeles Co., supra, Baldwin* v. *Ohio Tp. et al.*, 70 Kan. 102, 78 Pac. 424, 67 L. R. A. 642, 109 Am. St. Rep. 414.

Defendant invokes the rule that where the evidence shows an injury may have resulted from one or several causes but only one of the causes can be attributed to the defendant's negligence, the plaintiff must fail to recover, and this rule is amply supported by the authorities. However, since the case does not turn on this point we will not endeavor to explain or reconcile the evidence bearing upon proximate cause, which is the basis of a number of assignments of error by the defendant.

This case it seems to us is controlled by the majority line of authorities we have mentioned. While it is one of first impression in this state, we cannot see how any other rule could reasonably be adopted in such situation as presented by the facts in this case. Every reason which induced the adoption of the

rule as to flood waters in other jurisdictions applies here. Any other rule would be a hindrance and not a help to settlement and improvement, and does not offend against any of the principles with respect to the obstruction of waters, as heretofore adjudicated by the decisions of this court. Stressing the importance of this case we quote the apt language of counsel for the defendant in the concluding lines of their reply brief.

"The importance of this appeal is not indicated by the size of the judgment. It is a matter of common knowledge that there are countless washes in Arizona whose age, size and idiosyncrasies equal, if not exceed, those of Coyote Wash. The frequency or extent with which they will hereafter overflow or break their banks in time of flood is unpredictable. Their damage will by no means be visited exclusively upon railroad companies. Towns, farms and other interests will be equally jeopardized. The right to guard against overflow or escape water by means of dikes, or to drain back into the stream, must be preserved for all whose property would otherwise be intermittently menaced."

Under the unquestioned facts as disclosed by this record defendant was clearly entitled to a directed verdict at the close of the case for the reasons that it was apparent from all the competent testimony of the witnesses that defendant's dike intercepted and returned to Coyote Wash flood waters, merely increasing the flow of a well-defined and natural watercourse without exceeding the stream-carrying capacity which, in the exercise of its lawful right to protect its own property, it could do; the learned trial judge apparently erroneously concluded that the case was governed by *Maricopa, etc.,* v. *Roosevelt Irr. Dist., supra.*

Learned counsel for both sides have ably presented and briefed the case, thereby materially lessening the labor involved in the preparation of this opinion.

In view of our conclusion that the waters which it is alleged defendant caused to be discharged upon plaintiff's lands were flood waters, and that the rule applicable to such waters, which are a ''common enemy,'' can be invoked by defendant under the facts as shown by the record, plaintiff's judgment cannot be sustained in law, hence the judgment of the trial court is reversed and the case remanded with directions to dismiss the same.

McALISTER, C. J., and ROSS, J., concur.