775 P.2d 1154

**Barbara WHITE,**
**Plaintiff/Appellee/Cross–Appellant,**

v.

**PIMA COUNTY, a body politic,**
**Defendant/Appellant/Cross–Appellee.**

**No. 2 CA–CV 88–0310.**

Court of Appeals of Arizona,
Division 2, Department A.

March 31, 1989.

Review Denied July 11, 1989.*

---

* Corcoran, J., of the Supreme Court, was not present and did not participate in the determi-   nation of this matter.

Stubbs & Shubart, P.C. by G. Lawrence Schubart, Tucson, for plaintiff/appellee/cross-appellant.

Stephen D. Neely, Pima Co. Atty. by Thomas E. Dugal and John R. Neubauer, Tucson, for defendant/appellant/cross-appellee.

## OPINION

HOWARD, Judge.

The issue in this case is whether the common enemy doctrine can be a defense to a claim of inverse eminent domain arising out of damage caused by floodwaters. The trial court held that it did not, rejecting a jury instruction on the doctrine offered by Pima County. The jury returned a verdict in plaintiff's favor for $213,945 and the county appealed. The appellee has filed a cross-appeal which we shall treat as a cross-issue because the cross-appellant is not seeking to enlarge any of her rights. See *City of Phoenix v. Long*, 158 Ariz. 59, 761 P.2d 133 (App.1988).

## I. FACTUAL BACKGROUND

In 1983 the plaintiff owned 160 acres of land near Tucson in the floodplain of the Santa Cruz River which cut through the plaintiff's property and flowed in a northwesterly direction when it contained water.

The plaintiff's property had been farmed in the past, but in 1983 there were no crops and the only improvements were some irrigation ditches, a farm road, a well and a gas line running to the well.

The county owned the adjacent downstream property west of the plaintiff. Its property was along the north bank of the Santa Cruz River. This property consisted of 120 acres on which there were two landfills, the Old Marana Landfill and the Tangerine Road Landfill.

The Old Marana Landfill had been in continuous existence and use from approximately 1964. It consisted of a pit around which there was a three- to four-foot-high dirt berm on the east and south sides of the landfill and a chainlink fence around the base of the berms. The berms and fence were placed around the landfill pursuant to the requirements of the Arizona Department of Health Services which regulates landfills. The purpose of the berms was to floodproof the landfill so that floodwaters from the Santa Cruz River would not enter the landfill and the fence was erected to control access to the site and prevent papers from blowing out of the landfill.

The Tangerine Road Landfill was under construction in 1983. It was located directly north and adjacent to the Old Marana Landfill and had a cement and dirt berm around it, approximately eight to ten feet high to floodproof it and a chainlink fence around the top of the berm for security purposes and to prevent papers from blowing out.

In October 1983 a flood occurred in southeast Arizona that was of unprecedented magnitude. It produced the largest flow of water in the Santa Cruz River in recorded history. Needless to say, the river overflowed in the area of the plaintiff's and Pima County's property. It overflowed the banks of the river, flowed in a northwesterly direction across the plaintiff's property and onto the county's property. The berms and fence around the Old Marana Landfill and the berm around the Tangerine Road Landfill backed up some of the water onto the plaintiff's property, thereby increasing in the immediate area of the landfills the depth of the floodwaters already covering plaintiff's property.

Among the damages sustained by plaintiff's property were erosion of the topsoil, deposition of river sediment onto the property, destruction of the irrigation ditches and gas line and bank erosion. The plaintiff claimed that the landfills caused all of her property damage and filed this lawsuit.

## II. THE CONTENTION OF THE PARTIES

The county contends that the common enemy doctrine which applies to private landowners in Arizona applies with equal force to condemning authorities. The plaintiff disagrees. She contends the Arizona Constitution prohibits application of the doctrine to a condemning authority.

In her cross-issues plaintiff argues that the common enemy defense has been abrogated by statute, that the trial court erred by refusing to allow her to show this and further erred by rejecting her offer of proof which showed that the county could have constructed the landfill in another

manner which could have avoided or minimized her damages.

## III. THE LAW

### A. *The Common Enemy Doctrine*

The common enemy doctrine as it relates to floodwaters is well established in Arizona. In *Southern Pacific Company v. Proebstel,* 61 Ariz. 412, 150 P.2d 81 (1944), the court adopted the following distinction between floodwaters and surface waters:

> "Flood waters are distinguished from surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term 'flood waters' is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gulley or depression, does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse."

61 Ariz. at 418, 150 P.2d at 83, quoting 26 Cal.Jur. 280. One legal effect of this distinction was there stated:

> "... [O]ne has the right to protect himself against 'flood waters,' that is, waters of the character last described, and for that purpose to obstruct their flow onto his land, and this even though such obstruction causes the water to flow onto the land of another."

61 Ariz. at 419, 150 P.2d at 84, quoting *Horton v. Goodenough,* 184 Cal. 451, 194 Pac. 34 (1920). The court then concluded:

> The defendant in this case has not collected the waters upon its right of way and discharged the same immediately upon plaintiff's land; it has merely raised its own premises so as to dike against and prevent the flow of water thereon. It has protected itself and prevented invasion of its premises of the flood waters of the stream. If, thereby, the waters which are turned back and prevented from flooding over its right of way damage the lands of the plaintiff, the case is one of *damnum absque injuria.* Defendant has done nothing further than to exercise its common law right of protection against flood waters. It is presumed that plaintiff may do the same.

*Id.* at 421, 150 P.2d at 84. In accord, *Gillespie Land and Irrigation Company v. Gonzalez,* 93 Ariz. 152, 379 P.2d 135 (1963) and *Markiewicz v. Salt River Valley Water Users Association,* 118 Ariz. 329, 576 P.2d 517 (1978).

The privilege to embank against floodwaters is qualified to the extent that an owner of land subject to overflow of floodwaters who undertakes protective measures may not obstruct the flow of a natural watercourse. *Kennecott Copper Corporation v. McDowell,* 100 Ariz. 276, 413 P.2d 749 (1966); *Diedrich v. Farnsworth,* 3 Ariz.App. 264, 413 P.2d 774 (1966). Nor may he collect the floodwaters and then cast them upon his neighbor. See *Southern Pacific Company v. Proebstel, su-pra.*

### B. *The Common Enemy Doctrine And The Floodplain Statutes*

There is no doubt that the common enemy doctrine as applied to floodwaters is based on the common law. See *Gerrard v. Crowe,* 1 A.C. 395, 16 A.L.R. 625 (English Court of Appeals 1920) and the cases cited therein. There is also no doubt that where the legislature has not clearly manifested its intent to repeal a common law rule, it will not be abrogated. *United Bank v. Mesa N.O. Nelson Co.,* 121 Ariz. 438, 590 P.2d 1384 (1979).

We turn to the statutes involved at the time of the 1983 flood. In 1973 the state legislature passed the Floodplain Act of 1973, ch. 106, Laws 1973, A.R.S. § 45–2341–2346.[1] The purpose of the act was set forth in Laws 1973, ch. 106, § 1:

> The purpose of this act is to empower the agencies of the state of Arizona, for lands owned by the state, and to empower encourage and assist cities, towns and

---

1. The Act of 1973 and additions has been re-numbered as A.R.S. § 48–3601 et seq.

counties of the state, to establish, along watercourses, streams and lakes, appropriate regulations which are part of a floodplain management program to:

1. Minimize flood damages and reduce the height and violence of floods which are caused by obstructions restricting the capacity of the floodways.

2. Prevent unwise encroachment and building development within floodplain areas.

3. Protect the life and property of citizens who have settled in floodplain areas.

4. Enhance property values of abutting floodplain lands.

5. Protect public health.

6. Reduce the financial burden imposed on the community, its governmental units and its citizens if such land is subject to flooding.

7. Enhance wildlife and recreation values where appropriate by preserving riparian vegetation in "green belts" along watercourses and floodplains.

A.R.S. § 45–2342(C) mandated the "floodplain board," in this case, the county, to adopt floodplain ordinances which were to include, inter alia:

1. Regulations for all subdivision of land, construction of dwelling units or commercial or industrial structures or uses which may divert, retard or obstruct flood water and threaten public health, safety or the general welfare.

2. Regulations which establish minimum flood protection elevations and flood damage prevention requirements for uses, structures and facilities which are vulnerable to flood damage.

A.R.S. § 45–2342(H) provides that nothing in the new act or in the regulations adopted pursuant to it shall:

1. Affect existing uses of property or the right to the continuation of the use.

2. Affect reasonable repair or alteration of property for the purposes for which such property was used on the effective date of this act or any regulation affecting such property takes effect.

A.R.S. § 45–2344 provided that:

Every new structure, building, fill, excavation or development located or maintained, within any floodplain in violation of floodplain regulations established by the floodplain board and without written authorization from such board is a public nuisance per se and may be abated, prevented or restrained by action of the state or any political subdivision thereof.

Pursuant to the statutory mandate the Pima County Board of Supervisors passed Ordinance No. 1974–86.

We find no abrogation of the common enemy doctrine in the Floodplain Act. The essence of the doctrine is the right to obstruct without incurring liability. While the act requires a county permit to build new dikes it does not address the issue of liability on the part of the political body or person who constructs the dike for the obstruction of floodwaters. And certainly it does not address the liability of those who have constructed dikes prior to the act. The doctrine, insofar as it immunizes the obstructor, still exists for those who comply with the local regulations or who are exempt from the ordinances.[2]

### C. The Common Enemy Doctrine And Its Relationship To The Condemning Authority

■■ We start with art. 2, § 17 of the Arizona Constitution. It provides, inter alia, "... No private property shall be taken or damaged for public use, without just compensation having first been made...."

The underlying policy of such a constitutional provision is to distribute throughout the community the loss inflicted upon the individual by the making of public improvements—to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society. *Holtz v. Superior Court of the City and County of San Francisco,* 3 Cal.3d 296, 90 Cal.Rptr. 345, 475 P.2d 441

---

**2.** We do not address at this time the issue of the liability of those persons who have failed to comply with the local regulations but who

would have received a permit if they had applied for one.

(1970); *Belair v. Riverside County Flood Control,* 47 Cal.3d 550, 253 Cal.Rptr. 693, 764 P.2d 1070 (1988).[3]

In California the common enemy doctrine is applicable to condemning authorities. In *Archer v. City of Los Angeles,* 19 Cal.2d 19, 24, 119 P.2d 1, 4–5 (1941), the court construed the "or damage" provision of its constitution and held:

The provision permits an action against the state, which cannot be sued without its consent. It is designed, not to create new causes of action, but to give a remedy for a cause of action that would otherwise exist. The state is therefore not liable under this provision for an injury that is damnum absque injuria. If the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state. [citations omitted] In the present case, therefore, plaintiffs have no right to compensation under article 1, section 14 if the injury is one that a private party would have the right to inflict without incurring liability.

The court went on to hold, inter alia, that no liability could be imposed against the defendants because their actions would not have given rise to a cause of action if they were private individuals.

In *Albers v. County of Los Angeles,* 62 Cal.2d 250, 42 Cal.Rptr. 89, 398 P.2d 129 (1965), the court realized that its rationale in *Archer* was too broad. It recognized that the liability of the condemning authority under the "or damage clause" of its constitution does not depend on whether there was common law liability.[4] In *Albers,* which was not a floodwater case, the court held that any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed was compensable under the California Constitution. But, in so doing, the court recognized two exceptions, one of which is relevant here; those cases in which the state at common law had the right to inflict the damage.

In Holtz v. Superior Court of the City and County of San Francisco, supra, the court took a further opportunity to explain the common enemy exception to inverse eminent domain liability:

The fulfillment of the broad "cost spreading" purpose of the constitutional provision, as clarified in *Albers,* requires a limited application of the *Archer* exception rather than defendants' proposed expansive one. The doctrine of the common law "right to inflict damage," emanating from the complex and unique province of water law, has been employed in only a few restricted situations, generally for the purpose of permitting a landowner to take reasonable action to protect his own property from external hazards such as floodwaters. [citations omitted] In some ways the language of the "right to inflict damage" projects a misleading concept, because the essential common characteristic of this category of cases is not that they all involve the infliction of injury on others, but rather that they all involve injury resulting from the landowner's efforts to protect his own property from damage. In recognition of the generally perceived reasonableness of such action and, as a policy matter, to encourage protective measures to preserve land resources, certain types of protective measures were cloaked in a legal "privilege." [citations omitted]

3 Cal.3d at 306–07, 90 Cal.Rptr. at 351, 475 P.2d at 447. The rule of non-liability was reiterated in the latest California case of Belair v. Riverside County Flood Control, supra, except that in a flood control project there is an enormous damage-producing potential from a defective public flood control project. In such cases the court ruled that the public agency must act reasonably, which means that the reasonableness of the public agency's conduct must be determined on the facts of each case, taking into consideration the public benefit and the private damages in each case.

---

**3.** California has a constitutional provision similar to ours. See art. 1, § 19 of the California Constitution.

**4.** See also 2 Nichols on Eminent Domain § 6.27[2] (Rev. 3rd Ed.1987).

We are not dealing with a flood control project here. The county is acting like any other landowner. It should be and is entitled to the benefits of the common enemy doctrine like any other riparian owner. To hold otherwise would fail to recognize the public policy of the doctrine as explained in the *Holtz* case and would defy logic by making a condemning authority liable simply because it has the power of eminent domain when it is doing nothing more than trying to protect its property.

### D. *The Cross–Issues*

 We have previously held that the common enemy doctrine has not been abolished by statutes dealing with floodplain control. The remaining issue is appellee's contention that the trial court erred by rejecting her offer of proof as to alternative methods of constructing the landfills. We do not believe such considerations are relevant in view of the restrictive way the doctrine is applied in Arizona. The right is limited to dike against the flow of the waters. In so doing, the landowner must act reasonably and if he does not direct or increase the floodwaters against the adjoining property other than the increase incident to their failure to find access to his land, the landowner has acted reasonably.

### CONCLUSION

Arizona follows the common enemy doctrine as it applies to floodwaters. Under this doctrine a riparian owner may dike against and prevent the invasion of his premises by floodwaters. If, thereby the waters which are turned back damage the lands of another, it is a case of damnum absque injuria. This common enemy doctrine was not abrogated by the floodplain statutes is available to those who comply with or are exempt from the floodplain regulations, and is likewise available to a condemning authority when it is protecting its property like any other riparian owner. We do not decide the extent of the applicability of this doctrine to flood control projects or other public projects when the public body is acting in its role as a condemning authority.

Reversed.

LIVERMORE, P.J., and ROLL, J., concur.