26 P.3d 1171

**WEST MARICOPA COMBINE, INC., an Arizona corporation, Plaintiff–Appellant,**

v.

**ARIZONA DEPARTMENT OF WATER RESOURCES; Rita Pearson, in her capacity as the Director of the Arizona Department of Water Resources; 10K L.L.C., an Arizona limited liability company; and The Town of Buckeye, a municipal corporation, Defendants–Appellees.**

No. 1 CA–CV 00–0086.

Court of Appeals of Arizona, Division 1, Department D.

June 5, 2001.

---

Martinez & Curtis, P.C., By William P. Sullivan, Phoenix, Attorneys for Appellant.

Arizona Department of Water Resources Legal Division, By Michael J. Pearce, Chief Counsel, W. Patrick Schiffer and Charles L. Cahoy, Phoenix, Attorneys for Appellee Arizona Department of Water Resources and Rita Pearson.

Mack & Herold, P.C., By Richard H. Herold, and Richard V. Mack, Phoenix, Attorneys for Appellee 10K, L.L.C.

## OPINION

THOMPSON, Judge

¶ 1 At issue is whether Arizona Revised Statutes Annotated (A.R.S.) § 45–173 (1994 & Supp.2000) authorizes West Maricopa Combine's (WMC) use of the Hassayampa riverbed to move Central Arizona Project (CAP) water through private property over the property owners' objection. Both the superior court and the Arizona Department of Water Resources (ADWR) found that the private property owners' real property rights trumped WMC's right to access CAP water via the Hassayampa riverbed. Based on Arizona's longstanding policy encouraging the full use of scarce water resources and the plain language of A.R.S. § 45–173, we reverse. We hold that the consent of streambed owners is not required before WMC may make beneficial use of an existing natural watercourse to move its appropriated water and for water storage purposes pursu-

ant to A.R.S. § 45–811.01 (1994 & Supp. 2000).

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 WMC is an Arizona corporation and the sole shareholder of four corporations providing domestic water to Arizonans. Since 1987, WMC has held a subcontract allowing it the use of CAP water but has had no method of taking or storing that water.

¶3 CAP water runs from the Hoover Dam through much of Arizona. WMC proposes accessing the CAP at a location near the Hassayampa River. At that point, WMC will take its allotted apportionment of the CAP water and transfer it, via a water turn-out pipe, to the Hassayampa riverbed. From there the water will flow downstream and eventually soak into the ground. The water will replenish the natural aquifer and WMC, by virtue of its permit, will draw the groundwater from the aquifer through its downstream wells without exceeding its current groundwater allowance.

¶4 In furtherance of this plan, WMC applied to ADWR for a managed underground water storage facility permit pursuant to A.R.S. § 45–811.01 in July 1995.[1] ADWR found that WMC's permit application was "complete and correct" and provided public notice of WMC's application pursuant to A.R.S. § 45–871.01 (1994 & Supp.2000). Four objections to the application were filed with ADWR, including objections by 10K L.L.C. (10K) and the Town of Buckeye (the town).[2] The proposed permit would allow WMC to move CAP water through six miles of Hassayampa riverbed; approximately one and one-half miles of that riverbed runs through 10K's property. 10K adamantly protested any use of "10K's land" by WMC.

¶5 WMC filed an amended application for a permit after attempting to address some of the objections, including 10K's original protest, by moving the turn-out location. Subsequently, ADWR denied the objections and issued a conditional permit to WMC.[3]

¶6 10K and the town filed notices of appeal and requested a hearing before the Office of Administrative Hearings. A pre-hearing conference was held before an administrative law judge. 10K argued that WMC had no right to locate an underground storage facility in 10K's portion of the Hassayampa riverbed. 10K asserted that its private property rights were protected by A.R.S. § 45–814.01(H) (1994) and that the Arizona Legislature by virtue of A.R.S. § 37–1129.01 (1993) had disclaimed any ownership of the riverbed. The administrative law judge was persuaded by these arguments and issued an order recommending the denial of WMC's permit and denying any further hearings.

¶7 On February 5, 1999, Director of ADWR Rita Pearson issued a decision of the director adopting the administrative law judge's recommendation and rescinding WMC's permit. WMC filed a motion for rehearing and review. Director Pearson denied WMC's motion.

¶8 WMC next filed a complaint against ADWR in superior court under the Administrative Review Act, A.R.S. §§ 12–901, 914 (1992 & Supp.2000), claiming ADWR's decision to rescind WMC's permit was "arbitrary, capricious, contrary to law and invalid . . . ." 10K and the town were also named defendants. 10K filed a motion for summary judgment. Again, 10K argued that the 10K section of the Hassayampa riverbed was its private property pursuant to A.R.S. § 37–

---

1. Despite the statutory term "storage facility," it is clear that no alteration is to be made to the riverbed itself other than the addition of water.

2. 10K's objection did not address the issue on appeal; rather it incorporated by reference the objections filed by others. Another objection raised the ownership issue as did ADWR itself, and ADWR and the administrative law judge determined that the issue was properly available for consideration. We exercise our discretion to reach the merits of this matter.

3. The ADWR permit stated as condition number eleven, "This permit does not exempt the permittee from any other local, state or federal law that may be applicable, including but not limited to the laws of real property involving use of and access to the Hassayampa River streambed and other property necessary for the operation of the facility."

1129.01 and that those property rights could not be disturbed under A.R.S. § 45–814.01. ADWR supported 10K's motion for summary judgment.

¶ 9 After oral argument, the superior court granted summary judgment against WMC. The superior court found that the decision of ADWR was "not contrary to law, not arbitrary or capricious nor an abuse of discretion. . . . " 10K failed to include a request for attorneys' fees in the form of judgment submitted to and entered by Judge Schneider. WMC filed a timely notice of appeal. We have jurisdiction.

## ISSUE RAISED ON APPEAL

¶ 10 Did the trial court err in affirming ADWR's recission of WMC's managed underground storage facility permit on the basis that WMC did not have the consent of property owner 10K?

## STANDARD OF REVIEW

¶ 11 This court accepts an agency's factual findings unless they are arbitrary, capricious, or an abuse of discretion. *See Rice v. Arizona Dept. of Economic Sec.*, 183 Ariz. 199, 201, 901 P.2d 1242, 1244 (App. 1995). An administrative agency's statutory interpretation, however, is reviewed *de novo*. *See Brodsky v. Phoenix P.D. Ret. Sys. Bd.*, 183 Ariz. 92, 95, 900 P.2d 1228, 1231 (App. 1995). Thus, we independently review ADWR's statutory analysis of A.R.S. §§ 45–173 and 814.01(H) in the issuance of an underground water storage permit.

## ANALYSIS

¶ 12 The legislature created a method for persons to apply for an underground storage facility permit. *See* A.R.S. § 45–811.01. Section 45–811.01 outlines five criteria to be considered in the grant of an underground storage facility permit. A.R.S. § 45–811.01(C)(1)–(5). The consent of private property owners is not mentioned.

¶ 13 Nevertheless, 10K argues that "[t]he essence of private property is the right to exclude others," including the right to exclude water from running through the natural riverbed traversing 10K's Arizona property. It argues that this right prevents WMC from locating an underground storage facility in the Hassayampa. 10K persuaded both the superior court and ADWR that any "invasion" of its real property was strictly prohibited by A.R.S. § 45–814.01(H).

¶ 14 Arizona is an arid desert and we have a policy predating statehood that encourages the full and beneficial use of scarce water resources. *See, e.g.*, A.R.S. § 45–173. For the following reasons, we reverse and order that summary judgment be entered in favor of WMC. We begin our analysis with the plain language of A.R.S. § 45–173 and the historical context of that statute, and end by addressing 10K's arguments.

## I. A.R.S. § 45–173 EXPLICITLY AUTHORIZES USE OF A NATURAL WATERWAY TO CARRY THE WATER OF ANOTHER

¶ 15 At issue is whether A.R.S. § 45–173 authorizes WMC's use of the Hassayampa riverbed to move water downstream. 10K argues that A.R.S. § 45–173 does not give WMC the right to "use 10K's real property" to run water down the naturally existing Hassayampa riverbed. We disagree.

¶ 16 Section 45–173 is titled "Use of natural waterway to carry water of another or for other water projects" and states in relevant part:

Although the waters which naturally flow in the natural channel of a stream have been previously appropriated and put to beneficial use by others, **the channel may be used to carry water of another or used for the location of an underground storage facility** . . . if such use can be made without diminishing the quantity of water which naturally flows therein the use of which has been appropriated.

A.R.S. § 45–173(A)(emphasis added). A stream is:

a watercourse having a source and terminus, banks and channel, through which waters flow, at least periodically. . . . [It] does not lose its character as a watercourse even though it may break up and disappear. . . . [A] continuous flow of water is not necessary to constitute a stream and its waters stream waters.

S. Pac. Co. v. Proebstel, 61 Ariz. 412, 418, 150 P.2d 81, 83 (1944); see also Neal v. Hunt, 112 Ariz. 307, 311, 541 P.2d 559, 563 (1975).

¶ 17 The facts relevant to the application of this statute to this case are basically undisputed. It is undisputed that the Hassayampa is a natural watercourse. It is undisputed that WMC has rights to CAP water. There is no evidence disputing either 10K's ownership of the land or that the Hassayampa runs through it. There is no allegation that 10K has any rights to water flowing from either the CAP or the Hassayampa. There is no assertion that WMC's proposal would impair prior appropriators of this generally dry riverbed. Further, there is no dispute that WMC's proposed use is a beneficial use of the water. See A.R.S. § 45–151(B).

¶ 18 The plain language of A.R.S. § 45–173 specifically contemplates that private property be used to carry "water of another or used for the location of an underground storage facility." We are obligated to follow A.R.S. § 45–173. See Carden v. Golden Eagle Ins. Co., 190 Ariz. 295, 297, 947 P.2d 869, 871 (App.1997) (citing Lowing v. Allstate Ins. Co., 176 Ariz. 101, 103, 859 P.2d 724, 726 (1993) (best way to give effect to the legislative intent is to follow the clear and unequivocal language of the statute)). The plain reading of the statute comports with the longstanding policy of this arid western state.

¶ 19 We agree with WMC that A.R.S. § 45–173 provides a longstanding statutory basis for an "economical and convenient method of transporting and storing waters through natural channels" without prior consent by persons owning property along the route of the river. As discussed below, this is true even if the legislature later succeeds in disclaiming the state's property rights in the land under Arizona's navigable riverbeds. See Defenders of Wildlife v. Hull, 199 Ariz. 411, ¶ 59, 18 P.3d 722, 737–38 (App.2001) (finding A.R.S. § 37–1129.01 unconstitutional as applied).

**A. Arizona Has Historically Allowed Movement of Water Through Private Property to Suit Beneficial Users**

¶ 20 Section 45–173 codifies a longstanding principle encouraging the beneficial use of Arizona's scarce supply of water. The notion underlying A.R.S. § 45–173, allowing the movement of water "of another" through natural watercourses, has long been an integral part of Arizona water law.

¶ 21 The Arizona Territorial Legislature expressly reserved the right to use natural watercourses to move and store waters. R.S. §§ 4202–03 (1901). The Territorial Legislature stated that persons who owned stored waters "shall have the right to make use of the natural channels of streams in this Territory to conduct said waters to the place or places where they shall desire to use said waters ..." and provided for the use of natural watercourses to move stored waters even when all of the water naturally present had been appropriated. Id.

> These provisions were enacted early in the history of the territory, and probably existed as they are now when the territory was a part of old Mexico. The intention was to make the use of water, as much so as practicable, within the reach of all, **and to guard it against monopoly by private ownership on the one hand, and against being hemmed in by the ownership of the adjacent land,** liable to be acquired and held by speculators, on the other hand. The wisdom of this policy, under the physical conditions existing in the territory, must be apparent to every one.

Oury v. Goodwin, 3 Ariz. 255, 275–76, 26 P. 376, 383 (1891) (emphasis added).

¶ 22 The statutory allowance to move water remained substantially unaltered until 1986 when the legislature adopted a comprehensive water storage and recovery program to assist in using the waters of the Colorado River to which Arizona was entitled. See Sec. 14, Chap. 289, Laws of 1986. In 1986 the legislature added the provisions allowing for water storage in Arizona's natural watercourses to coincide with the dual policy of preserving groundwater and utilizing the Colorado River waters. See A.R.S. §§ 45–801, –895 (1994), 45–1701, –1722 (1994).

¶ 23 The water WMC wishes to direct down the Hassayampa for storage pursuant

to the Underground Storage Act comes from the Colorado river water flowing through the CAP. Arizona is entitled to:

> receive two million eight hundred thousand acre feet of main stream Colorado river water annually ... [and] it is essential to the continued well being, health and prosperity of the people of the state that the state proceed promptly to establish, develop and execute an appropriate program for the development and utilization of such water.

A.R.S. § 45–1701(2) (citing *Arizona v. California*, 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964) (declaring public policy of Arizona)); *Taft v. Ball, Ball & Brosamer, Inc.*, 169 Ariz. 173, 175, 818 P.2d 158, 160 (App. 1991). This court previously recognized that "[t]he CAP, like other canals, is indispensable for the maintenance of life and prosperity in Arizona" and indispensable to utilization of the Colorado River. *See Taft*, 169 Ariz. at 175, 818 P.2d at 160.

¶ 24 Based on Arizona's enduring and fundamental policy encouraging the full use of scarce water resources and the plain language of A.R.S. § 45–173, we hold that real property owners such as 10K may not prevent a beneficial user from using an existing natural watercourse for water storage purposes.

## II.  10K's ARGUMENTS

### A.  Section 45–173 is Limited to Competing Users of Water

■ ¶ 25 In its answering brief, 10K makes several assertions related to A.R.S. § 45–173 that must be dispelled. First, 10K argues that the express language of A.R.S. § 45–173 "only governs the relative rights of two competing water users. . . ." This view is erroneous and contrary to standard statutory construction.

■ ¶ 26 "[T]he best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). Here, A.R.S. § 45–173 clearly allows the use of any natural watercourse in Arizona for the transport of water so long as the use of other prior appropriators is not diminished. *See* A.R.S. § 45–173(A). Arizona *already* has a statute that addresses apportionment between prior appropriators. *See* A.R.S. § 45–151(A) (1994). 10K's reading of A.R.S. § 45–173 would make it redundant to A.R.S. § 45–151(A), which provides that all water users are subject to the rights of prior appropriation. Adopting 10K's interpretation would render one of the two statutes superfluous. The language of the two statutes is clear, as is Arizona's historical policy to the same effect. We cannot accept an interpretation of A.R.S. § 45–173 that would render it superfluous and contrary to the policy encouraging beneficial use of scarce water resources.

### B.  Section 45–173 is Limited to Natural Water Flow

■ ¶ 27 10K next asserts that while the channel "may" be used by competing prior appropriators, its use is limited exclusively to "natural" water flow. To this end, 10K asserts that the Hassayampa River is typically "dry for long periods of time." Thus, 10K argues, WMC does not have the right to divert CAP water down the Hassayampa.

¶ 28 10K's interpretation is not borne out by either the language of the statute or Arizona case law. Section 45–173 provides that a channel may be used for "the location of an underground storage facility." A.R.S. § 45–173(A). In fact, the plain reading of the statute indicates a *specific* contemplation of the addition of water that is not "natural" to the waterway. *See id.* And, here again, A.R.S. § 45–173 is not needed to establish a right to use natural channels to transport water that naturally flows there.

■ ¶ 29 Arizona water law is aimed at maximum beneficial use of a scarce resource. "It is, and has ever been, the policy of this state to make the largest possible use of the comparatively limited quantity of water within its boundaries." *Pima Farms Co. v. Proctor*, 30 Ariz. 96, 102, 245 P. 369, 371 (1926). In *Taft*, this court previously found that the CAP canal system "brings with it the benefits and burdens of a natural watercourse." 169 Ariz. at 176, 818 P.2d at 161. Neither

the statute itself or the policy of maximum use comports with 10K's stilted attempt to distinguish CAP waters from the natural waters of the Hassayampa.

### C. Section 45–173 is Limited By A Private Property Owner's Rights to Exclude Others

¶ 30 10K next asserts that each property owner's right to "exclude others" from its privately owned land includes the right to prohibit the flow of water down naturally occurring watercourses on their real property. To this end, 10K argues that any application of A.R.S. § 45–173 is restricted by A.R.S. § 45–814.01(H). We note that both ADWR and the superior court were persuaded by this argument. We conclude that A.R.S. § 45–814.01 does not trump A.R.S. § 45–173; it merely reflects the well-established distinction between water rights and real property rights in Arizona.

¶ 31 Section 45–814.01(H) reads:

Nothing in this article shall be construed as modifying or infringing on any existing water rights or private property rights nor shall anything in this article prevent any person or entity, whether governmental or private, from undertaking any flood control projects, including removal of vegetation within the channel of the stream or on the adjacent floodplain or diverting the permitted flow from the natural stream channel at the end of the permitted period.

¶ 32 10K's interpretation of this statute, that "it prohibits any alteration of 10K's private property rights" including control of water running in the riverbed, is nonsensical and ahistorical. If 10K's interpretation of A.R.S. § 45–814.01(H) was accurate, then it would amount to saying that with consent of a property owner you can do what you wish on his real property. That *is already the law,* as applied to the real property itself, in this state. *See Champie v. Castle Hot Springs, Co.,* 27 Ariz. 463, 468, 233 P. 1107, 1108 (1925) (restating well-known proposition that real property owners may proceed on their own land at their pleasure as long as they do not act contrary to law).

¶ 33 What 10K fails to comprehend is that Arizona has, at least for the past century, distinguished between water rights and property rights. Arizona's water law repudiates riparian water rights and is wholly contrary to water law in most of these United States. The doctrine of riparian water rights as traditionally known has been abrogated in the State of Arizona. *Austin v. Chandler,* 4 Ariz. 346, 350, 42 P. 483, 483 (1895); *Beals v. State,* 150 Ariz. 27, 31, 721 P.2d 1154, 1158 (App.1986) (citing *Austin*).

In California, Nevada, and other Pacific states and territories, the common-law rule [of traditional riparian law rights] has been modified, owing to the peculiar condition of the settlers and miners upon the public lands; and the right to running water exists without private ownership.

*Hill v. Lenormand,* 2 Ariz. 354, 357, 16 P. 266, 268 (1888) (citation omitted).

¶ 34 Arizona has always followed the prior appropriation doctrine in an attempt to deal with the scarcity of water. *See In re San Carlos Apache Tribe v. Superior Court,* 193 Ariz. 195, 205, 972 P.2d 179, 189 (1999) (citing *Clough v. Wing,* 2 Ariz. 371, 17 P. 453 (1888)). The Arizona Constitution repudiates the idea of riparian water rights and embraces the law of prior appropriation. *See* Ariz. Const., article XVII, § 1.

¶ 35 Water rights can be bought and sold distinct from land. *See, e.g., Paloma Inv. Ltd. P'ship v. Jenkins,* 194 Ariz. 133, 138, 978 P.2d 110, 115 (App.1998) (discussing a water rights agreement as a property right capable of conveyance separate from the land). Land can be bought and sold distinct from any water. *Id.*

¶ 36 The essence of western water law is that water, not land, is the scarce resource:

This territory is vast in extent, and rich in undeveloped natural resources.... The one great want is water. With this resource of nature made available, the mountains and the deserts may be made to yield fabulous wealth, and Arizona become the home of a vast, prosperous, and happy people. But with water in this territory 'cribbed, cornered, and confined' it will

continue and remain the mysterious land of arid desert plains, and barren hill-sides, and bleak mountain peaks.

*Oury*, 3 Ariz. at 274–75, 26 P. at 382 (citation omitted).

¶ 37 "It is the recognized law in Arizona that when a person acquires land he takes it subject to any water rights which might have been initiated according to the law." *England v. Hing*, 8 Ariz.App. 374, 378, 446 P.2d 480, 484 (1968), *vacated on other grounds*, 105 Ariz. 65, 459 P.2d 498 (1969).

> Private ownership and monopoly of the streams, lakes, and ponds was prohibited.... To make the water of these streams, lakes, and ponds available, the right of way must be provided for ditches and canals over the lands of those who might become the owners of the soil on the borders of the streams or the margins of the lakes and ponds. **Without this provision it is easy to see how a few individuals might throw themselves across the pathway of progress** and development, by acquiring the lands on the margins of the streams and around the lakes and ponds. The water intended for the free and general use would be surrounded, hemmed in, and without a right of way available under the law the vast tracts of land lying on the outside must forever remain desert, or pay the tribute of extortionate and unconscionable demands.

*Oury*, 3 Ariz. at 276, 26 P. at 383 (emphasis added). In other words, the ownership of the land is distinct from ownership of the water. *Id.*

¶ 38 Riparian landowners, those persons who own land bordering or including natural waterways, do not have the right to exclude water from running to beneficial users.

> Arizona's founders wisely rejected the idea that a water right "accrues to land adjoining the water." They opted, instead, for the opposite approach: "A man has no right to water that adjoins or flows through his land...." In the face of a huge overdraft of largely non-recharging groundwater, the courts and the legislature have apparently breathed life into the prohibition of riparian rights.... The ef-

fect is to limit landowners' ability to resist conjunctive management of ground and surface water on the basis of their claimed "rights" to the percolating groundwater found beneath their land.

John D. Leshy & James Belanger, *Arizona Law Where Ground and Surface Water Meet*, 20 Ariz. St. L.J. 657, 707 (1998). Riparian owners may not divert water from prior appropriators. *Hill*, 2 Ariz. at 357, 16 P. at 268 ("[p]laintiffs, as prior appropriators, had acquired vested rights in these waters, and the purchase and ownership of the lands on both sides ... did not divest these rights"). In other words, for more than one hundred years the ownership of Arizona land has been distinct from ownership of the water. *See id;* Leshy & Belanger, *supra*, at 707.

¶ 39 Further evidence of this principle is seen in the abundant case law holding that water users have a right to receive their undiminished allocation without interference by real property owners. *See, e.g, Hill*, 2 Ariz. at 357, 16 P. at 268 (purchase of upstream lands adjacent to river did not authorize interference with river waters); *Pima Farms*, 30 Ariz. at 107, 245 P. at 373 (upstream owner's usage may not lower the water table requiring deepening of downstream prior appropriator's wells).

¶ 40 Arizona land owners may not obstruct the beneficial use of the scarce water resources of this state. 10K's interpretation would erroneously require the consent of all owners of land which includes natural waterways before CAP water could be transported and stored for use. Section 45–173 prevents land owners from interfering with the transference and storage of water not naturally found in the channel of which beneficial use is sought.

¶ 41 Contrary to 10K's argument, A.R.S. § 45–814.01(H) does not restrict the application of A.R.S. § 45–173. The plain language of A.R.S. § 45–814.01(H) clarifies that *"nothing in that article shall be construed* as modifying or infringing on existing rights." A.R.S. § 45–814.01(H) (emphasis added). Section 45–814.01(H) reinforces that a storage facility permit does not change the pre-

existing status quo which gives precedence to beneficial uses of water that are prior in time.

### D. WMC'S Proposed Diversion of CAP Water is Not a Taking

¶ 42 Section 45–173 does more than simply codify the rights of water users in the natural channel that delivers their appropriation. By allowing "**the location** of an underground storage facility," the statute expressly authorizes a new use of an existing channel by the introduction of water originating in another water system. A.R.S. § 45–173(A) (emphasis added). 10K asserts that such statutory authorization for the use of 10K's real property by another is a governmental taking without just compensation. This is erroneous because the permitting process does not alter the pre-existing rights of the parties.

¶ 43 Arizona follows a "first in time, first in right" philosophy to water allocation. This basic rule was first reduced to statute in 1893 as "the person or persons, company or corporation first appropriating water ... shall always have the better right to the same." See C.J. Fred C. Struckmeyer, Jr. & Jeremy E. Butler, *Water, A Review of Rights in Arizona* 37 (1960). Since 1919 this view has been expressed in A.R.S. § 45–141(A): "[T]he waters of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent ... belong to the public and. are subject to appropriation and beneficial use...." Such provisions seek to protect the beneficial use of water from being obstructed by owners of adjacent lands. See Leshy & Belanger, *supra,* at 707.

¶ 44 Any inquiry into a governmental taking from a private party must first address whether the private party ever had the "right" at issue. Douglas L. Grant, *Western Water Rights and the Public Trust Doctrine: Some Realism About the Takings Issue,* 27 Ariz. St. L.J. 423, 427 (1995).

Specifically, [it] require[s] inquiry into the nature of the owner's title to see whether it is subject to any "pre-existing limitation"

authorizing the governmental action. In other words, the court must ascertain whether the owner's title is subject to an inherent limitation that "background principles of the State's law of property and nuisance already place upon land ownership".... The owner is entitled to compensation, however, if the governmental action "goes beyond what the relevant background principles would dictate."

*Id.* (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), among others).

¶ 45 10K's title to the land adjacent to the Hassayampa River was taken subject to existing water rights. Specifically, 10K took its title subject to the inherent limitations arising from the state's reservation of the natural channels to move and store water. No taking can arise by this pre-existing limitation and this result is entirely harmonious with A.R.S. § 45–814.01(H).

### E. Ownership of the Watercourse Lands

¶ 46 10K asserts that it has title to the real property underlying the Hassayampa River pursuant to A.R.S. § 37–1129.01(A), which transferred title of non-navigable waterways to landowners. The administrative law judge found 10K's ownership of the property to be dispositive. Section 37–1129.01(D) reads in pertinent part:

The state waives, relinquishes and disclaims any right, title or interest based on navigability and the equal footing doctrine in the bed of the Hassayampa river from the Gila river confluence to headwaters.

Since briefing, A.R.S. § 37–1129.01 has been determined by this court to be unconstitutional. *See Defenders of Wildlife,* 199 Ariz. at 426–27, ¶ 59, 18 P.3d at 738. The ownership of the waterways outlined in A.R.S. § 37–1129.01 has reverted to its prior status. *Id.* Thus, 10K cannot rely on A.R.S. § 37–1129.01 to establish property rights to that section of the Hassayampa riverbed. But we find that A.R.S. § 45–173(A) *alone* provides sufficient independent legal basis for WMC's use of the watercourse to transport its allocated CAP water, even if the legislature's

disavowal of property rights in A.R.S. § 37–1129.01 had been deemed constitutional.

### F. WMC'S Proposed Diversion is Not a Trespass

¶ 47 10K further asserts that WMC's running of water down the Hassayampa riverbed would constitute a trespass. To this end, 10K cites *Taft v. Ball, Ball & Brosamer, Inc.,* 169 Ariz. 173, 818 P.2d 158 (App.1991). Trespass may only be found here if 10K has the right to exclude others from using the Hassayampa, and it does not have such a right. *See* W. Page Keeton *et al.,* Prosser and Keeton on the Law of Torts, § 13, at 67 (5th ed.1984) (trespass is "an invasion ... which interfere[s] with the right of exclusive possession of the land ...."). Trespass occurs where naturally flowing water is cast on the real property of another "who is under no duty or obligation to receive the same." *Schlecht v. Schiel,* 76 Ariz. 214, 218, 262 P.2d 252, 254 (1953). A claim for trespass would not lie under these facts because 10K was obliged to receive WMC's water. *See id.*

### III. FEES

#### A. 10K's Fees

¶ 48 10K requested attorneys' fees in its answer in the superior court. 10K failed to include a request for attorneys' fees in the form of judgment it submitted to the superior court. The superior court determined that it lacked jurisdiction and thus declined to award fees to 10K after the entry of judgment. 10K did not appeal that ruling and it is not at issue here.

¶ 49 10K next submitted, to this court, an unsolicited twenty-seven page motion seeking approximately $135,000 in attorneys' fees. The purported bases for 10K's fee request are A.R.S. §§ 12–349, –350 and Rule 11, Arizona Rules of Civil Procedure; in other words, fees were requested as sanctions. Since we have found WMC's position to be meritorious, obviously we do not find that WMC's actions warrant sanctions. Therefore 10K's motion for fees is denied.

#### B. WMC's Fees

¶ 50 WMC seeks its costs, attorneys' fees and other expenses incurred on appeal and below pursuant to A.R.S. §§ 12–348, –341, –342 and Rule 21 of the Arizona Rules of Civil Appellate Procedure (Rule 21). As the prevailing party, WMC is entitled to its fees pursuant to A.R.S. § 12–348 and costs pursuant to A.R.S. §§ 12–341, –342 and Rule 21, and we award them. This award is made subject to the limitations in A.R.S. § 12–348(E). Although it is clear from the record below and its actions in this court that 10K's position, largely adopted by ADWR, generated much of the attorneys' fees at issue, WMC has not requested and we have not found a basis to award fees against 10K.

### CONCLUSION

¶ 51 We find that the superior court's and ADWR's interpretation of A.R.S. §§ 45–173(A)and 45–814.01 as requiring the consent of adjacent landowners before granting WMC's permit is contrary to law. We reverse and remand with directions that the superior court enter summary judgment for WMC. WMC is awarded its attorneys' fees and costs as mandated by the statutes referenced above.

CONCURRING: MICHAEL D. RYAN, Presiding Judge and PHILIP L. HALL, Judge.